**In re NICOLE B. et al.**

**No. 96–192–Appeal.**

Supreme Court of Rhode Island.

Dec. 8, 1997.

Frank P. Iacono, Jr., Court Appointed Sp. Advocate, Regina M. Gibbs, Anthony E. Angeli, Jr., Thomas Corrigan, Jr., Providence, for Plaintiff.

Paula Rosin, Asst. Public Defender, for Defendant.

Before WEISBERGER, C.J., and LEDERBERG, BOURCIER, FLANDERS and GOLDBERG, JJ.

## OPINION

WEISBERGER, Chief Justice.

This case comes before the Supreme Court on appeal from a decree of the Family Court terminating the parental rights of the respondents (respondents or parents), to their three minor children, Nicole, born July 21,

1989; Jennifer, born November 10, 1991; and Fransisco, born December 22, 1992. For the reasons elaborated below, we affirm the judgment of the Family Court. The facts insofar as relevant to the instant appeal are as follows.

The respondents first came to the attention of the Department for Children, Youth and Families (DCYF) in January 1992, after their then two-month-old daughter Jennifer was admitted to Rhode Island Hospital in critical condition, suffering from an alarming array of severe physical injuries. The respondents presented the infant at the emergency room with a high fever and told the attending physician that she felt "floppy." A thorough physical examination revealed that Jennifer's injuries, including multiple skull fractures, brain contusions, fractured ribs, and a broken leg, were in various stages of healing, indicating more than one physical trauma or episode of abuse. The respondents could offer no explanation for their daughter's critical condition. As a result DCYF's Division of Child Protective Services obtained protective detention of Jennifer and her two-and-a-half-year-old sister Nicole and placed the children with a foster family. In addition DCYF filed child-neglect and abuse petitions regarding both children.

After living with her foster family for several weeks, Nicole began to exhibit sexually provocative behavior. Consequently DCYF arranged for Nicole to be evaluated by two separate sexual-abuse counselors, both of whom concluded that Nicole had been sexually abused. Thereafter visitation between the father and Nicole was suspended. The respondents consistently denied knowledge of any abuse whatsoever. Instead respondents suggested that perhaps Nicole had acquired her rather advanced sexual knowledge by witnessing respondents engage in sexual intercourse on more than one occasion.

On April 1, 1992, after a trial in the Family Court, the trial justice entered a decree that included the following findings: (1) the father had physically abused and neglected Jennifer; (2) the mother had neglected Jennifer, and (3) both parents had neglected Nicole, which finding was based on the fact that Nicole had acquired sexual knowledge be-

yond her years while in their care. Both children were, thereafter, committed to the care, custody, and control of DCYF.

On April 8, 1992, the parents entered into a case plan (case plan or plan) with DCYF, the goal of which was reunification. In fact this was to be the first of four such case plans developed by DCYF with reunification as the goal. Pursuant to these plans DCYF provided substantial services to the family, including psychiatric counseling and evaluation for both parents and the children, medical services for Jennifer, and chaperoned visitation.

From the inception of respondents' relationship with DCYF neither parent could explain Jennifer's injuries, but both insisted they had never abused any of their children. Moreover, both parents steadfastly maintained that each had never witnessed the other act in a violent or questionable manner toward either of the two girls. The mother suggested the possibility that Jennifer's injuries resulted from two-year-old Nicole's jealousy toward her newborn sibling, claiming to have seen the older child strike the baby with a toy telephone.

Unknown to DCYF, the mother became pregnant in 1992. The respondents actively concealed this information because they feared that the state would seek custody of this child as well. On December 22, 1992, Fransisco was born, regarding whom DCYF filed charges on January 28, 1993. On September 2, 1993, a second Family Court justice found that respondents had neglected Fransisco as well as having created a substantial risk of harm to the child. Accordingly Fransisco was committed to the care, custody, and control of DCYF.

On May 19, 1994, DCYF filed termination-of-parental rights (TPR) petitions in regard to all three children. The TPR petitions, filed prior to the 1994 amendments to G.L. 1956 § 15-7-7, alleged that (1) the parents were unfit by reason of conduct toward any child of a cruel or an abusive nature, § 15-7-7(1)(b)(ii), and (2) the children were in the custody of a licensed or governmental agency for a period of at least six months, and the integration of the children into the home of

the parents is improbable in the foreseeable future because of conduct or conditions unlikely to change. Section 15–7–7(1)(c).[1]

After a fourteen-day trial in the Family Court between November 1995 and February 1996, a third justice of the Family Court, taking judicial notice of the 1992 decree, granted the TPR petitions in respect to all three children. Both parents testified at the trial and reiterated their unwavering denial of responsibility. The trial justice found that respondents had formed a "united front," each parent corroborating the innocence of the other. After considering the testimony of all the witnesses and weighing their respective credibility, the trial justice rejected respondents' theories, finding them "incredible, lame and implausible."

In her written findings of fact and conclusions of law of February 1, 1996, the trial justice found by clear and convincing evidence that respondents were unfit parents, in that Jennifer had suffered "severe abuse and permanent damage" at the hands of her father and that the children's mother either "allowed the abuse or should have been aware of the abuse that was being inflicted upon the child by the father," that Nicole had been neglected by both parents, and that the "parents created a substantial risk of injury to Fransisco."

The parents argue on review that their trial in the Family Court was twice tainted by error warranting reversal. First, they contend that the admission of Nicole's sexual-abuse counselor's testimony concerning Nicole's revelations of sexual abuse by her father constituted impermissible hearsay. Second, respondents challenge the trial justice's conclusion that DCYF had made "reasonable efforts" to reunify their family. Section 15–7–7(b)(1). We shall consider each issue in the order in which it was raised. Any additional facts necessary to the resolution of the issues will be discussed in the balance of the opinion.

■ A Family Court justice's findings are entitled to great weight and will not be dis-

turbed absent a showing that the trial justice was clearly wrong or that material evidence was overlooked or misconceived. *In re Antonio G.,* 659 A.2d 672, 673 (R.I.1995). Therefore, we have examined the record to determine whether legally competent evidence exists to support the trial justice's findings. *In re Frances,* 505 A.2d 1380, 1384 (R.I.1986).

■ Parents enjoy a fundamental liberty interest in the "care, custody, and management" of their children. *See Santosky v. Kramer,* 455 U.S. 745, 758–59, 102 S.Ct. 1388, 1397, 71 L.Ed.2d 599, 610 (1982); *In re John,* 605 A.2d 486, 487 (R.I.1992). This interest does not "evaporate simply because they have not been model parents or have lost temporary custody of their child to the state." *Santosky,* 455 U.S. at 753, 102 S.Ct. at 1395, 71 L.Ed.2d at 606; *In re Peter G.,* 577 A.2d 996, 998 (R.I.1990). As a result, before the state may permanently sever the rights of a parent in his or her natural children, the state must prove by clear and convincing evidence that the parent is unfit. *See In re Kyle S.,* 692 A.2d 329, 334 (R.I. 1997). Indeed, removal of children from a biological parent without a finding of unfitness would be constitutionally repugnant. *See Santosky,* 455 U.S. at 760, 102 S.Ct. at 1398, 71 L.Ed.2d at 611; *Stanley v. Illinois,* 405 U.S. 645, 649, 92 S.Ct. 1208, 1211, 31 L.Ed.2d 551, 557 (1972). Prior to an adjudication of unfitness, the parents and the child share an interest in avoiding the erroneous termination of this natural relationship. *In re Kyle S.,* 692 A.2d at 334. However, once a parent has been adjudicated unfit, the balance shifts so that the "best interests of the child outweigh all other considerations." *In re Kristen B.,* 558 A.2d 200, 203 (R.I.1989).

I

■ The parents' first challenge to the Family Court proceedings attacks the admission of the testimony of Jane Willis (Willis), the sexual-abuse therapist who counseled Nicole from October 1993 through the time of trial. Willis testified that during their coun-

1. The July 1994 amendments to § 15–7–7(1)(c), redesignated in the 1996 Reenactment as § 15–7–7(a)(3), changed the time requirement from six months to twelve months. For purposes of this opinion we will refer to the statute in its present form.

seling sessions together, Nicole revealed her father's sexually abusive behavior. Nicole described how "Daddy Frank" made her lick his *"bicho"* (Portuguese for "penis") and how he would put his *bicho* into her *"bichoque"* (Portuguese for "female genitals and buttocks"). Nicole also reiterated what she had been telling her foster family as well as other service providers—that her father had physically abused both her and her sister, Jennifer.

The trial judge allowed the above testimony over the objection of respondents' trial counsel. At trial and again on appeal respondents insist that Nicole's statements to Willis were inadmissible hearsay beyond the scope of the relevant exceptions to the hearsay rule, namely, Rule 803(4) of the Rhode Island Rules of Evidence and G.L.1956 § 14-1-69.

Hearsay may be defined as any out-of-court statement or statements offered for the truth of the matter asserted. R.I. R. Evid. 801. When hearsay testimony is admitted into evidence, the opponent is deprived of his or her ability to confront the declarant and thus attack the assertion made. Such admission effectively deprives the nonproffering party of that great engine of truth: cross-examination. *See* 5 Wigmore, *Evidence* § 1367 (Chadburn rev.1974). Nevertheless, the rule against hearsay is not without exception. The exceptions to the rule are based upon the rationale that some out-of-court statements made under specific conditions possess a requisite indication of reliability and trustworthiness such that the benefit of their admission outweighs the disadvantage of forgoing in-court testimony.

Rule 803(4) provides an exception to the rule against hearsay, Rule 802, for "[s]tatements made for purposes of medical diagnosis or treatment." The logic underlying this exception is obvious: a patient has a strong motive to speak truthfully and accurately because any ensuing treatment will depend in part on the information conveyed. The threshold requirement to a statement's admissibility under this exception is whether the statement when made, was reasonably pertinent to treatment. *See State v. Ucero*, 450 A.2d 809, 815 (R.I.1982). Statements admissible under this rule need not have been made to a physician, "rather their admissibility 'hinge[s]' on whether what has been related by the patient will assist or be helpful in the diagnosis or treatment of his ailment.'" *In re Jean Marie W.*, 559 A.2d 625, 630 (R.I.1989) (quoting Advisory committee's note to Rule 803(4)).

Section 14-1-69, alternatively, "'liberalized the common law test for admission of children's out-of-court statements concerning their physical abuse' by eliminating 'the requirement that the declarant must have been "laboring under the stress of nervous excitement" when the statement was made.'" *In re Jessica C.*, 690 A.2d 1357, 1360 (R.I.1997) (quoting *In re Deborah M.*, 544 A.2d 572, 574 (R.I.1988)).

Section 14-1-69 provides in relevant part:

"In any * * * termination trial where a petition has been filed by [DCYF] in accordance with * * * [§ ]15-7-7 in the family court, the court may, in its discretion, permit as evidence any statement by a child under the age of thirteen (13) years old about a prescribed act of abuse * * * by a parent * * * if that statement was made spontaneously within a reasonable time after the act is alleged to have occurred, and if the statement was made to someone the child would normally turn to for sympathy, protection, or advice."

This court's review of the record, however, makes clear that Willis's testimony, whether accorded great or little weight, was not necessary to the trial justice's determination regarding the physical abuse of Jennifer. We therefore shall assume without deciding, for the purpose of the instant appeal, that the testimony of Willis may have been erroneously admitted. Nevertheless, any such error did not result in prejudice to either the mother or the father since the holdings of both Family Court justices clearly absolved respondents of sexual abuse. The importance respondents seek to attach to Willis's hearsay testimony is simply not reflected in the record; neither the 1992 trial nor the 1996 trial culminated with a finding by either trial judge that the father had sexually abused Nicole but rather that Nicole had

acquired sexual knowledge beyond her years while in the care of respondents. The issue of the alleged sexual abuse should not obscure the complete evidentiary picture considered by the trial judge, most significantly the severe physical abuse of Jennifer. Simply put, the record reveals ample, independent, competent evidence to support the trial justice's decision that these children had suffered physical abuse and neglect at the hands of respondents.

## II

■ The respondents' second claim of error is equally devoid of merit. They contend that the trial justice erred in concluding that DCYF made "reasonable efforts" to reunify respondents with their children. Initially it should be clarified that such a judicial determination, whether erroneous or not, was and is, at least as it concerns Jennifer, wholly irrelevant to the complete disposition of the present matter, given the allegation of cruel and abusive conduct proven at trial.

Under the Termination of Parental Rights statute, § 15–7–7(a)(1), (a)(2)(i), or (a)(2)(iii), the petitioning agency, as a condition precedent to termination, must satisfy the trial court by clear and convincing evidence that "reasonable efforts" were undertaken to "encourage and strengthen the parental relationship." Section 15–7–7(b)(1). In other words the agency, here DCYF, must satisfy the trial justice that reunification of the family was attempted in good faith. However, as we previously observed in *In re Jean Marie W.*, 559 A.2d at 632, when the termination petition alleges parental conduct of a "cruel and abusive nature," § 15–7–7(a)(2)(ii), "no such condition exists." 559 A.2d at 632.

In *In re Frances*, 505 A.2d at 1386, we first discussed circumstances under § 15–7–7(a)(2)(ii) when termination is not conditioned on a finding that the agency undertook "reasonable efforts" toward reunification. In that case DCYF sought the termination of a mother's parental rights to all five of her children, ranging in age from infancy to five years, after her eleven-month-old baby was admitted to Rhode Island Hospital's emergency room in critical condition. The mother failed to advance an adequate explanation for the "massive injuries to the [child's] brain that were caused by great force." 505 A.2d at 1384–85. In a manner similar to the facts in the case at bar, the injuries to the infant in *In re Frances* were in various stages of healing, indicating that the injuries had occurred over time. Affirming the trial justice's termination of the mother's parental rights in regard to *all* her children, we found that the trial justice had reasonably concluded that a "caring parent would have known the source of the injuries and would have reported this information to physicians or to the police if she had not caused them herself or permitted them to happen." *Id.* at 1385.

Likewise in *In re Jean Marie W.* DCYF sought the termination of a mother's parental rights to her two daughters, a four-year-old and a one-year-old, after the children were discovered by a Providence police officer responding to a breaking-and-entering complaint at the mother's address. Four-year-old Jean Marie and her sister, Veronica, were taken to Rhode Island Hospital's Pediatric Clinic. Jean Marie resisted a full physical examination, but lab tests revealed that she suffered from two sexually transmitted diseases, chlamydia and gonorrhea. Veronica was similarly diagnosed with chlamydia, as well as head lice and fleas, was developmentally delayed for her age, and showed the presence of cocaine metabolites in her urine. *In re Jean Marie W*, 559 A.2d at 627–28. In addition the testimony of the DCYF counselors who evaluated both children led this court to conclude that she had "explicit sexual knowledge of anal, oral, and vaginal intercourse." *Id.* at 632. Citing *In re Frances*, we held that in light of the "atrociousness of the abuse suffered by these children," the Family Court justice's decision to terminate the mother's parental rights without requiring the state to make efforts at reunifying her and her children was warranted, concluding that even the "slightest concern for their physical and psychological well-being would dictate that these children not be returned to such an environment." *In re Jean Marie W.*, 559 A.2d at 633.

Sadly, the facts underlying the instant appeal are remarkably similar to the aforementioned cases. The respondents, like the

mothers in *Jean Marie* and *Frances,* cannot explain Jennifer's injuries. The respondents fail to realize that it is not sufficient merely to issue joint denials of responsibility. As the parents and admitted primary caretakers of these children, the law holds respondents to a greater level of substantial responsibility and awareness concerning the well-being of their children than it otherwise might in the case of an adult relative or a stranger.

Balancing the interests of the parents, their three children, and the state leads us to conclude that the actions of the Family Court justice in terminating respondents' parental rights were fully justified. The family dynamics in the case at bar, like those in *In re Jean Marie W.,* and *In re Frances,* compel action rather than continued futile negotiation. The trial justice concluded that "without treatment, none of these children could be returned home; treatment could not be effected because of the parents' persistent denials; [and] further services clearly would not bring about 'admissions' by the parents." On this point we most emphatically agree, and nothing in our close inspection of the records in this case indicates otherwise. As the statutory language of § 15–7–7 and the case law make strikingly clear, there is a crucial qualitative difference between families experiencing difficulty, however dire, that is due to neglect, poverty, drug abuse, or poor parenting skills or judgment and the very different case presented under these facts. Here the parents have actively victimized one or more of their children through conduct amounting to the most odious form of betrayal. The Legislature's cognizance of this fundamental difference is manifest in its decision to exempt the "cruel and abusive" basis for termination from the so-called reasonable-efforts requirement of § 15–7–7(b)(1).

■ As for Nicole and Fransisco, it is both appropriate and permissible for a Family Court justice to consider earlier determinations concerning the neglect or abuse of one child in determining the parents' fitness, or lack thereof, concerning other children entrusted to their care and that "evidence of harm to one child of a family is relevant to the issues raised by a dependency-and-neglect petition regarding another child of the family." *In re Luz J.,* 447 A.2d 1148, 1152 (R.I.1982) (explaining that imputing the evidence gathered from one sibling to another permits the trial court to evaluate the case in its proper context); *see also In re Daniel B.,* 642 A.2d 672, 673 (R.I.1994) (same); *In re McKayla C.,* 618 A.2d 1264, 1265 (R.I.1993); *In re Lee,* 442 A.2d 893, 898 (R.I.1982) (Weisberger, J., concurring) (" '[t]he state's role in protecting children may properly be preventive of harm as well as remedial' "). " 'The state, under the scrutiny of the court, need not wait until a child's life has been permanently and irretrievably impaired before acting.' " *In re Lester,* 417 A.2d 877, 881 (R.I. 1980). Accordingly we perceive no logical or legal imperative mandating that Nicole and Fransisco must experience the horrific brutality Jennifer surely endured.

■ As the foregoing discussion foreshadows, our perusal of the relevant legislative language, the case law, and the facts of the instant case leads us to conclude that, given the trial justice's determination in respect to Jennifer, it is, at best, doubtful whether DCYF had any further obligation to expend *any* effort toward the reunification of respondents and their remaining children. In any event DCYF did in fact faithfully pursue a course of action in conjunction with respondents that was reasonably designed to effectuate the reunification of respondents with their children.

"Reasonable efforts" is a subjective standard subject to a case-by-case analysis, taking into account, among other things, the conduct and cooperation of the parents. *See In re Antonio G.,* 659 A.2d at 674. Here DCYF styled numerous case plans providing respondents with counseling, psychiatric evaluations, parenting programs, and bilingual interpreters. The children received foster-family placement, counseling, ongoing medical and developmental treatment, and chaperoned visitation. These substantial reunification efforts, undertaken over a period of approximately two years, were consistently undermined, however, by the parents' reticence, their seemingly blind support of each other, and their collective allegiance to utter denial. *See In re Kristen B.,* 558 A.2d

at 204 (explaining that termination was proper when the parents consistently denied existence of abuse and were unwilling to work toward reunification). In these circumstances DCYF expended greater efforts then the law would command.

For the foregoing reasons the respondents' appeal is denied and dismissed. The decree of the Family Court terminating the respondents' parental rights is affirmed. The papers of this case may be remanded to the Family Court.