**In re CHRISTINA V.**

**No. 98–248–Appeal.**

Supreme Court of Rhode Island.

April 21, 2000.

Frank P. Iacono, Jr., John J. O'Brien, III, Thomas J. Corrigan, Jr., Washington Crossing, PA, Anthony E. Angeli, Jr., for Plaintiff.

Paula Rosin, Frank J. Pannozzi, Providence, James Moretti, Cranston, for Defendant.

Present WEISBERGER, C.J., and LEDERBERG, BOURCIER, FLANDERS and GOLDBERG, JJ.

# O P I N I O N

PER CURIAM.

Both the respondent-mother, Donna Alden (mother), and the respondent-father, Carlos (father) appeal from a Family Court decree terminating their parental rights to their daughter, Christina V., who was born on May 26, 1991. Following a prebriefing conference before a single justice of this Court, we assigned this appeal to the motion calendar and ordered the parties to show cause why we should not resolve this appeal summarily. Because no cause has been shown, we proceed to do so.

On January 10, 1996, a Family Court trial justice concluded that the Department of Children, Youth, and Families (DCYF or department) had proven by clear and convincing evidence that Christina had been physically abused and neglected by her mother and physically and sexually abused by her father. As a result, Christina was committed to the care, custody, and control of DCYF. Thereafter, on January 29, 1997, the department filed a termination of parental rights (TPR) petition under G.L.1956 § 15–7–7(a)(3). After the TPR trial, a Family Court justice issued a written decision in which he concluded that Christina had lost confidence in her mother's ability to protect her from further sexual abuse by her father and that the mother's long-standing refusal to believe that the father had sexually abused Christina was the cause of this development. He stated:

> "It is questionable, considering her statements, that mother, even now, believes Christina. 'Her persistent tendency to place her own interests above those of the child demonstrate [*sic* ] that she has not made good faith efforts' to correct the situation which led to placement. *See In re Antonio G.*, 657 A.2d 1052 (R.I.1995)."

The trial justice also found that DCYF made reasonable efforts in this case to reunite Christina with her parents. The trial justice noted that DCYF had offered services to both parents from August 1994 through January 1996 (before the commitment trial) and that those services were refused.[1] He then granted the petition and terminated both parents' rights. After the trial justice entered a decree reflecting this decision, both the mother and the father appealed.

The mother argues that the trial justice erred in granting the TPR petition. She contends that the court should not have considered her refusal to accept DCYF's proffered services before the child's placement into DCYF's temporary care and custody as evidence that she had failed to cooperate with DCYF. The mother also contends that the trial justice erroneously held that G.L.1956 § 40–11–12.1 permits the Family Court to consider a parent's noncompliance with DCYF's suggested services during the time period before the child's more formal commitment to DCYF's care and custody. She asserts that a parent has no legal obligation to comply with DCYF's suggested social services before the court makes any legal finding of abuse or neglect against the parent at the commitment trial. The mother also suggests that even if a parent does have a duty to cooperate with proffered services before a formal commitment ruling, the court should not fault a parent who in good faith has refused to do so based upon advice of counsel. The father also insists that the trial court erred in finding that he failed to cooperate with proffered services before the court found he had abused the child and before the commitment of the child into DCYF's care and custody.

Based upon the mother's statement to a child protective investigator that she had recently permitted the father to have con-

---

1. It should be noted that these services were offered primarily because of DCYF's involvement with Christina's three older half-siblings who were previously committed to DCYF's care and custody.

tact with her children in violation of a no-contact restraining order issued by the Family Court, a master of that court authorized DCYF on August 12, 1994, to implement a forty-eight hour protective hold on Christina. On August 15, 1994, DCYF filed an ex parte petition requesting that the court grant an order of "detention" (temporary care and custody) for Christina. At a hearing on August 18, 1994, a Family Court justice granted temporary custody to DCYF, whereupon the parents, through their respective attorneys, entered denials of the allegations. The court ordered Christina to remain in DCYF's temporary custody pending a probable-cause hearing. At the probable-cause hearing on September 26, 1994, the court approved DCYF's further temporary care and custody of the child because the trial justice determined Christina was "at risk and should remain out of [the] home" until the commitment trial determined the parents' rights.

The court then committed Christina to DCYF's care, custody, and control after the conclusion of the commitment trial in January 1996. Later, at the TPR hearing, the trial justice concluded that the pre-August 1994 events and proffered services were relevant to the TPR determination because the same issues that led to problems with the mother's other three children—sexual abuse by the father and the mother's failure to acknowledge the abuse—surfaced in Christina's case as well. Relying on this Court's decision in *In re Luz*, 447 A.2d 1148 (R.I.1982), the trial justice noted that evidence of parental neglect towards Christina's siblings was also relevant to the parental-fitness issues raised in this case. Further, the trial justice suggested that the 1994 amendment to § 40–11–12.1 permitted the court to consider "a period of twelve (12) months after a child is placed in the care of the department" P.L.1994, ch. 196, § 1, after a probable-cause hearing or pursuant to an ex parte "detention" order, rather than

twelve months from the finding of abuse, neglect or dependency in a commitment trial. He then reasoned that this amendment expressed the Legislature's intent that "commitment or a finding of abuse, neglect, or dependency is not necessary to start the twelve (12) month [TPR] clock in G.L. § 15–7–7(a)(3)."

Where, as here, Christina's siblings were already committed to DCYF's care and custody and DCYF had offered and was continuing to offer services to the mother in connection with these children, we are of the opinion that the trial justice did not err in interpreting § 40–11–12.1 as he did, and in considering and relying upon the mother's refusal to accept services before Christina's formal commitment to DCYF's care, custody, and control in January 1996 as an appropriate factor to be weighed in the TPR calculus. We also hold that, wholly apart from this consideration, sufficient independent evidence also supported the ultimate TPR conclusion he reached.

When DCYF files an ex parte petition alleging neglect or abuse, the Family Court should take whatever actions are immediately necessary or appropriate to protect the child under § 40–11–7.1(a). These preliminary proceedings are generally quite short and may include an order removing the child from the custody of the parent(s). *See* § 40–11–7.1(a); Fam.Ct. R. Juv. P. 15(a). In theory, such an order provides care and protection for a child until the allegations of abuse or neglect can be adjudicated. Next, a hearing on the petition must be held within seven days. At this hearing, the court should advise the parent(s) of DCYF's allegations and allow them to enter a denial or admission of those allegations. *See* § 40–11–7.1(b)(1) and (2); Fam.Ct. R. Juv. P. 15(c)(1) and (2).

At this preliminary hearing the court must also advise the parent(s) of their right to a probable cause[2] hearing on the

---

2. The term "probable cause" is defined in G.L.1956 § 40–11–2(11) to mean:

ex parte petition. *See* Fam.Ct. R. Juv. P. 15(c)(5). Before such time as the probable cause hearing can be convened, the court is further authorized to "[m]ake an interim order in its discretion respecting the rights of the child." *Id.* at (c)(6). At the conclusion of the probable-cause hearing on the ex parte petition, the court may order continued "detention" of the child.

Once the Family Court finds, after a commitment trial, that a child has been abused or neglected, the court shall:

> "Place the child under the supervision of the department in his or her own home if the court makes a determination that the child will be safely maintained in the home or award the care, custody, and control of the child to the department upon such terms as the court shall determine. The court may place the custody of the child in the department until such time as it finds that the child may be returned to the parents or other person previously having custody or care of the child under circumstances consistent with the child's safety. *The court may require the parent or person previously having custody to undertake a program of counseling, including psychiatric evaluation and/or treatment as a prerequisite to the return of the child to his or her custody.*" Section 40–11–12(b). (Emphasis added.)

Thus, the preliminary proceedings may involve the placement and continued "detention" of an at-risk child in DCYF's care pending an adjudication on the neglect or abuse petition. The commitment trial establishes the more formal commitment of the child to DCYF's "care, custody, and control" upon an adjudication of abuse or neglect. *Id.* But it is only in conjunction with an adjudication of abuse or neglect that a parent may be required to comply

"facts and circumstances based upon as accurate and reliable information as possible that would justify a reasonable person to suspect that a child is abused or neglected. The facts and circumstances may in-

with court-ordered programs and DCYF services.

Section 40–11–12.1 (a)—one of the subsections on which the trial justice relied—merely provides that the department must file a motion for a hearing regarding the child's placement. The statutory requirement for DCYF to request a permanency hearing is triggered by an initial placement of a child into DCYF's care:

> "(a) Within a period of twelve (12) months after a child is *placed in the care of* the department of children, youth and families * * * and the child has resided in foster care or * * * has resided in an out-of-home program which provides services for children with disabilities, including but not limited to residential treatment programs, residential counseling centers, and therapeutic foster care programs, the department of children, youth and families shall file a motion in the family court requesting a permanency hearing on the status of the child." Section 40–11–12.1(a). (Emphasis added.)

The statute governing the termination of parental rights is § 15–7–7. Although there are a number of grounds for such termination, the relevant section in this case is § 15–7–7(a)(3). Section 15–7–7(a)(3) provides that a termination petition may be filed when:

> "The child has been placed in the legal custody or care of the department for children, youth, and families for at least twelve (12) months; and the parents were offered or received services to correct the situation which led to the child being placed, and provided further that there is not a substantial probability that the child will be able to return safely to the parents' care within a reasonable period of time considering the

clude evidence of an injury or injuries, and the statements of a person worthy of belief, even if there is no present evidence of injury."

child's age and the need for a permanent home."[3]

The twelve-month periods in these two statutes are separate and distinct. Under § 15–7–7(a)(3), a child must have been in DCYF care or custody for at least twelve months before a TPR petition can be filed. During that time and before a TPR petition can be filed, the parents must be offered or have received services so that they can attempt to correct the situation that led to the child's placement. Although it is possible that a child could be in DCYF care for twelve months after a probable cause hearing or after an ex parte "detention" order—indeed this happened to Christina—there is no requirement during that stage that a parent must comply with services or programs offered by DCYF. However, once there has been an adjudication of abuse, neglect, or dependency, and a consequent formal commitment of the child to DCYF's care and custody, then a parent may be ordered to comply with counseling or other services. See § 40–11–12(b).

■■■ Thus, a parent's refusal to cooperate with mandatory, court-ordered services *after* an adjudication of neglect or abuse, and a parent's lack of cooperation with DCYF *before* such an adjudication represent significantly different behaviors under the law. The former can certainly constitute one basis for terminating parental rights, but the latter only should be a factor that the court takes into consideration—along with the totality of other relevant circumstances—in resolving a TPR petition because the parents are not required at this stage of the proceedings to accept or to obtain such services. Furthermore, a parent's unwillingness to cooperate with DCYF before a commitment adjudication occurs—particularly because a child may have come into DCYF care on

a mere allegation of abuse or neglect that later turns out to be unfounded—should not be the principal grounds for terminating parental rights. Rather, it may be considered as one appropriate factor to be weighed, at least in cases like this one where other siblings have already been committed to DCYF's care.

■■■ It is well settled that "[p]arents enjoy a fundamental liberty interest in the 'care, custody, and management' of their children." *In re Nicole B.*, 703 A.2d 612, 615 (R.I.1997) (quoting *Santosky v. Kramer*, 455 U.S. 745, 758–59, 102 S.Ct. 1388, 1397, 71 L.Ed.2d 599, 610 (1982)). "This interest does not 'evaporate simply because they have not been model parents or have lost temporary custody of their child to the state.'" *Id.* (quoting *Santosky*, 455 U.S. at 753, 102 S.Ct. at 1395, 71 L.Ed.2d at 606). Consequently, before a state may permanently sever the rights of parents in their natural child, due process requires the state to prove, at a minimum, allegations of unfitness by clear and convincing evidence. *See Santosky*, 455 U.S. at 747–48, 102 S.Ct. at 1391–92, 71 L.Ed.2d at 603. Until there is an adjudication of parental unfitness, both "the child and [the] parents share a vital interest in preventing erroneous termination of their natural relationship." *Id.* at 760, 102 S.Ct. at 1398, 71 L.Ed.2d at 611.

■■ In this case, Christina entered into the temporary custody of the department following the filing of an ex parte petition on August 15, 1994. She remained in the temporary custody of the department following a probable cause hearing on September 26, 1994, until she was committed to the care, custody, and control of DCYF on January 10, 1996. Until the time of this 1996 commitment, no orders were in effect requiring the mother to comply with any services.[4] Our reading of the afore-

---

**3.** General Laws 1956 § 15–7–7(1) was amended to add a new subsection (c) in P.L. 1994, ch. 233, § 1, and its numbering was changed to § 15–7–7(a)(3) implicitly in P.L. 1996, ch. 404, § 1.

**4.** The hearing docket sheets between August 15, 1994, and January 10, 1996, indicate that no orders had entered relative to the mother participating in services provided by the department. In addition, the "Family Court

mentioned statutes is that a parent is not required to comply with DCYF's suggested reunification efforts until the Family Court has adjudicated dependency, neglect, or abuse. Moreover, basic fairness suggests that, notwithstanding the probable-cause hearing, parents should not be required to cooperate and participate in a reunification plan until there has been an adjudication concerning the abuse and/or neglect allegations. Nevertheless, even though the parents are not required to cooperate with proffered services, the trial justice did not err in relying upon the mother's lack of voluntary cooperation with DCYF's proffered services before the finding of abuse or neglect and before Christina was committed when, as here, other siblings were already committed to DCYF's care and when, as here, other independent bases existed for the TPR ruling. Nor do we believe that the mother's good-faith reliance on the advice of counsel in declining to cooperate with DCYF prevented the trial justice from considering her voluntary noncooperation with proffered services as an appropriate factor to be weighed in reaching his TPR decision.

When considering TPR appeals, this Court examines the record to determine whether legally competent evidence exists to support the trial justice's findings. See *In re Shaquille C.*, 736 A.2d 100, 101 (R.I.1999) (order). It is well settled that the findings of a trial justice sitting without a jury are entitled to great weight and that this Court will not disturb them on appeal unless they are clearly wrong or the trial justice misconceived or overlooked material evidence. See *In re Ryan S.*, 728 A.2d 454, 457 (R.I.1999) (per curiam).

Before terminating a parent's rights, the state must first prove by clear and convincing evidence that a parent is unfit. See *In re Nicole B.*, 703 A.2d at

615. The evidence in this case suggests that although the mother successfully completed the non-offender's counseling program, she remained unwilling to accept the allegations of sexual abuse committed by the father against her daughter. A psychological evaluation also revealed that the mother continued to question the veracity of her children's sexual-abuse allegations against the father and that the mother therefore would not benefit from further counseling services. The record in this case, including the mother's history, supports the trial justice's findings. Substantial evidence, as noted by the trial justice, shows that the mother's long-standing disbelief of the father's sexual abuse of her children rendered her unfit to meet her child's needs and, moreover, frustrated DCYF's efforts towards reunification. See *In re Jennifer R.*, 667 A.2d 535, 536–37 (R.I.1995) (per curiam) (affirming a TPR when the trial justice found that the mother "[was] totally aligned with her husband [the abuser] * * * [and] therefore, * * * [was] unable to be supportive to her daughters [and] unable to protect them" showing that "conditions * * * [were] not likely to change"). Indeed, this Court has recognized repeatedly that parental denial of abuse and resistance to counseling undermine reunification efforts. See *In re Nicole B.*, 703 A.2d at 618.

The father also contends that the trial justice erred in finding that DCYF made reasonable efforts toward reunification. He maintains that there were "minimal" efforts by the department to strengthen the parent-child relationship. In light of the evidence presented, however, this argument is unpersuasive. After the court found that the father had sexually abused Christina, he still continued to deny the sexual abuse in a counseling setting. The trial justice decided that it was not any omission on DCYF's part, but rather the father's continued denial of having abused

Dispositional Hearing Sheet" dated August 10, 1995, is blank and contains no orders or decrees. The hearing held on August 10,

1995, would have occurred pursuant to G.L. 1956 § 40–11–12.1.

his daughter that hampered potential reunification.

"Reasonable efforts" is a flexible standard subject to a case-by-case analysis, taking into account, among other things, the conduct and cooperation of the parents. *Id.* Our review of the record in this case reveals support for the trial justice's findings. The evidence shows that the department developed numerous case plans and made appropriate referrals for the father to address the sexual-abuse issues and that the father's refusal to cooperate repeatedly undermined these efforts.

Finally, the father argues that the trial court abused its discretion in denying his motion to have Christina interviewed by his psychiatrist. As a result, he asserts, he was prevented from presenting evidence concerning what was in the child's best interest. He contends that the court, in effect, precluded his ability to defend the petition. The father, however, fails to cite to any authority to support his position. The trial justice denied the motion for another psychiatric interview of the child on the grounds that it would be detrimental to the child. Pursuant to Rule 35 of the Rules of Procedure for Domestic Relations, the trial justice's decision to order a physical or mental examination was discretionary. Rule 35(a) provides in pertinent part:

> "In an action in which the mental or physical condition * * * of a party, or of an agent or a person in the custody or under the legal control of a party, is in controversy, the court may order the party to submit to a physical or mental * * * examination by a physician * * *. The order may be made only on motion for good cause shown * * *."

 Here, the trial justice determined that the child already had undergone extensive psychiatric evaluations and he concluded that no good reason existed on the eve of trial to subject her to yet another evaluation. We hold that, in denying the father's motion, the trial justice did not abuse his discretion in concluding that no

good cause had been shown to subject the child to another examination of this kind.

Based upon the foregoing, we conclude that the trial justice did not err in granting the TPR petition. Therefore, we deny the appeals and affirm the Family Court's judgment.