## In re ISABELLA C.

No. 2002–400–Appeal.

Supreme Court of Rhode Island.

July 15, 2004.

Frank P. Iacono, Jr., Esq. (For CASA), Thomas J. Corrigan, Jr. (For DCYF), for Plaintiff.

Janice M. Weisfeld, Esq., Providence, for Defendant.

Present: WILLIAMS, C.J., FLANDERS, GOLDBERG, and SUTTELL, JJ.

## OPINION

PER CURIAM.

The respondent-father, Daniel Fox (Fox or respondent), appeals from a Family Court decree terminating his parental rights to his daughter, Isabella, and specifically his rights to give consent to adoption.[1]

This case came before the Supreme Court for oral argument pursuant to an order directing the parties to show cause why the issues raised in this appeal should not summarily be decided. After considering the arguments of counsel and examining the record and the memoranda filed by the parties, we are of the opinion that

---

1. The mother is not a participant in this appeal. She has indicated a willingness to enter into a direct consent open adoption with Isabella's foster family.

cause has not been shown, and we affirm the judgment of the Family Court.

## Facts and Travel

The facts surrounding baby Isabella's entry into the world are disturbing and unfortunate. Isabella's mother, Monica Castillo (Castillo or mother), gave birth on December 20, 2000, at home without medical care or assistance. Castillo has been diagnosed with schizophrenia and mild mental retardation. When Fox arrived home, he discovered the baby exposed, and in a room apart from her mother. He immediately called 911 for emergency medical services.

Isabella was taken to Memorial Hospital in Pawtucket. At the hospital, it was discovered that her umbilical cord had been cut in an unsterile fashion, and she was suffering from hypothermia because of inadequate warming after birth. A physician's report of examination was filed, and Isabella was placed on a seventy-two-hour hold. On December 22, 2000, the Department of Children, Youth and Families (DCYF) filed an ex parte petition alleging that she was neglected, and was granted temporary custody of Isabella.

A DCYF investigation revealed that Fox physically and mentally abused Castillo. Fox reportedly would lock Castillo in her room when he was not at home. The investigation also alleged that he did not let her take her medication for schizophrenia during the four years that they lived together. Photographs of Castillo's room in their apartment revealed a hook-and-eye latching mechanism on the outside of her door. Furthermore, there was no telephone in Castillo's room. After the emergency medical workers took Isabella and Castillo to the hospital, numerous bruises were discovered on Castillo's body, and her retina was detached because she had been severely struck in the head. As a

result, Fox was arrested and charged by the Central Falls Police with domestic assault. He was held at the Adult Correctional Institutions (ACI) for the next three months on the assault charges and an unrelated marijuana charge. On December 14, 2001, he pled guilty and was convicted of assault on an impaired person, felony domestic assault, abuse/neglect of an impaired adult for deprivation of services, and possession of marijuana. He was sentenced to twenty years, with five years to serve, fifteen years suspended, and fifteen years probation on the felony assault, concurrently with lesser sentences on the other charges.

When DCYF became involved, Kimberly Joly–Sow (Joly–Sow) was assigned as the department social caseworker. She met with Fox on February 1, 2001, and again on March 8, 2001, at the ACI to establish a case plan for treatment and services. Fox refused to sign the proposed case plan, however, because it included a provision for sexual offender counseling to which he objected. At the March 8 meeting, and at several others, according to Joly–Sow, Fox agreed with the case plan goal to reunify Isabella with her mother. He indicated that "the best place for a child was with their mother." At that meeting, Joly–Sow further explained that if Fox cooperated with the case plan that he could be reunited with his daughter if reunification with Castillo was not successfully achieved.

After he was released from the ACI on March 21, 2001, Fox again refused to sign the case plan. On May 25, 2001, however, Fox admitted to the allegations of neglect, apparently pursuant to a plea agreement in which DCYF agreed to forgo its request that Fox cooperate with a sexual offender evaluation. Fox did agree to complete a comprehensive mental health, substance abuse and parenting evaluation, and signed a case plan to that effect on October 25,

2001. The case plan also provided that if convicted on the then-pending criminal charges for domestic assault, he would attend domestic violence counseling.

On June 22, 2001, Fox was referred to John P. Parsons, Ph.D. (Dr. Parsons) for a psychological evaluation. Joly–Sow testified that this was the only referral she made for Fox until the evaluation was complete because Fox wanted to undergo only one evaluation at a time.

Doctor Parsons, a clinical psychologist, conducted a psychological assessment and parenting evaluation of the respondent over five sessions between August 24, 2001, and October 6, 2001. He testified that the purpose of the evaluation was to determine Fox's psychological state and his capacity to parent his daughter safely and effectively. He described Fox's cooperation with the evaluation process as "variable" because Fox missed some appointments, but was cooperative when he did attend.

Doctor Parsons met with Fox four times for psychological assessment, and one time for an interactive assessment of Fox with his daughter. Doctor Parsons took a case history from Fox and administered a standard battery of psychological tests, including intelligence and mental status assessments. He said that Fox had an average to low average intelligence, that he was slow and deliberate with his speech, that his memory functions were intact, that he was irritable at times, but generally cooperative. Doctor Parsons further testified that his diagnostic impressions of Fox included "physical abuse of adult" and cannabis abuse in sustained full remission. He also diagnosed Fox as having a personality disorder with "narcissistic and antisocial features." In observing Fox with his daughter, Dr. Parsons characterized Isabella's behavior as "avoidant." Furthermore, when he told Fox to change the child's diapers, Fox protested that that was "woman's work."

Accordingly, Dr. Parsons concluded that reunifying Fox with Isabella would be "a high risk reunification." He found that Fox was given to unpredictable behavior, was impulsive, and had difficulty accepting responsibility for his actions. These and other factors led to his assessment that Fox would not be a safe parent. He cautioned that if reunification were to proceed, Fox should have toxicology screens, a substance abuse evaluation, anger management and domestic violence counseling, and a parenting assessment. He also recommended that no reunification commence until Fox's felonies were adjudicated.

On January 24, 2002, DCYF filed a petition to terminate Fox's parental rights to Isabella. The petition alleged three grounds for termination: (1) chronic substance abuse; (2) behavior or conduct seriously detrimental to a child; and (3) that the child had been in DCYF custody for at least twelve months and there was not a substantial probability that she would be returned to her father's care within a reasonable period.

A trial on the petition took place in Family Court in March 2002. In addition to the testimony of Joly–Sow and Dr. Parsons, Eunice Delahos (Delahos), the child's maternal aunt, was presented as a witness. She testified that Isabella had been living with her, her husband and three children since January 10, 2001. Delahos also explained that Isabella's mother and grandparents live on the second floor of their three-family home in Central Falls. According to Delahos, the child is loved and well-cared for, and has daily contact with her mother. She also testified that she and her husband would like to adopt Isabella and enable Castillo to remain in close contact with her daughter.

On the second day of trial, DCYF moved to amend the termination petition to include an additional ground for terminating Fox's parental rights. The amended ground was the allegation that Fox is unfit by reason of conduct or conditions seriously detrimental to the child because of his imprisonment for such a duration as to make it impossible for him to care for Isabella for an extended period of time. At that time, Fox's conviction on the assault, abuse, neglect, and marijuana charges had been entered into evidence. The court allowed the amendment over Fox's objection.

Fox testified on his own behalf for the sole purpose of establishing that he was eligible for parole on May 16, 2002. However, the trial justice confirmed that the parole hearing on May 16, 2002, would be Fox's first hearing, and that his sentence otherwise would run five years if he were denied parole.

After witness testimony ended, Fox's counsel presented his closing argument, during which he conceded that "he's not a sympathetic figure as he comes before [the][c]ourt." He argued, however, that the law required the state to make reasonable efforts to provide Fox with treatment and counseling. He further argued that "[t]here's been no case plans for reunification with the father. The case plans * * * are for adoption or for reunification with the mother." In addition, he argued

> "The state I think has an attitude or a feeling that no matter what services they would have provided for this gentleman, it really would not have helped much given the history of the case. They still have to provide them."

Despite counsel's argument that DCYF had not sustained its burden of proof for each of the allegations in the petition, the trial justice granted the petition for termination on all grounds. The trial justice

found by clear and convincing evidence that Fox was unfit to parent Isabella and that terminating his rights was in Isabella's best interest. Specifically, he found that Fox had a substance abuse problem based upon the results of a substance abuse evaluation and Fox's conviction for possession of marijuana. He also found that Fox had physically abused Isabella's mother. He further found that DCYF made all reasonable efforts to provide services to Fox. In addition, he remarked that "[t]he possibility of [Fox] receiving parole the first time he applies for it is remote at the very best." He also doubted Fox's credibility because "Mr. Fox tells whatever story he thinks will help him at the time." The trial justice's opinion of Fox's suitability for parenting was reflected when he opined, "I would hesitate to place any kind of animal in this man's charge." A decree reflecting the trial justice's decision was entered on April 1, 2002, from which Fox timely appealed.

## Discussion

On appeal, Fox presents two arguments advocating for the reversal of the Family Court decree. First, he argues that the trial justice erred in permitting DCYF to amend the petition to terminate his parental rights in the middle of trial. Second, he argues that the trial justice erred in finding that DCYF had proven any of its allegations in the termination petition by clear and convincing evidence. Fox maintains that "the evidence did not clearly prove that he was unfit by reason of extended incarceration, an ongoing substance abuse problem, or conduct or conditions that would prevent Isabella's return to her father's care within a reasonable time."

■ When reviewing a ruling of the Family Court terminating parental rights, we must examine the record to determine whether the findings of the trial justice are

supported by legal and competent evidence. *In re Russell S.*, 763 A.2d 648, 649 (R.I.2000) (per curiam) (citing *In re Dennis P.*, 749 A.2d 582, 585 (R.I.2000) (per curiam)). The findings of a trial justice sitting without a jury are entitled to great weight and will not be reversed on appeal unless the justice overlooked or misconceived material evidence, or was otherwise clearly wrong. *In re Robert S.*, 840 A.2d 1146, 1149 (R.I.2004) (per curiam) (citing *In re Chaselle S.*, 798 A.2d 892, 895 (R.I. 2002) (per curiam)). "We have previously stated that before 'permanently sever[ing] the rights of a parent in his or her natural children, the state must prove by clear and convincing evidence that the parent is unfit.'" *In re Russell S.*, 763 A.2d at 649 (quoting *In re Nicole B.*, 703 A.2d 612, 615 (R.I.1997)). Once the Family Court rules that a parent is unfit, "the balance shifts so that the 'best interests of the child outweigh all other considerations.'" *Id.* (quoting *In re Kristen B.*, 558 A.2d 200, 203 (R.I.1989)).

■ Fox first argues that DCYF should not have been permitted to amend its petition to include an additional ground upon which to terminate his parental rights in the midst of trial. Fox contends that, in contrast to amendments to dependency, neglect, and abuse petitions that are specifically provided for under Rule 14 of the Family Court Rules of Juvenile Proceedings,[2] Rule 18(a) of the Family Court Rules of Juvenile Proceedings does not give the Family Court the authority to permit an amendment to a petition for termination of parental rights. He asserts that because of the severe consequences of a termination petition, the Legislature would have explicitly granted the authority to allow such amendments if it had intended to do so. In addition, Fox argues that he was prejudiced by the introduction of the amendment because DCYF knew of his incarceration before the trial commenced and chose not to amend the petition before trial; hence, he was prejudiced by having to defend this allegation at trial.[3] He further asserts that he would not have stipulated to the entry of the judgment of conviction had he been aware of this allegation.

Rule 18(a) details the procedure for composing and filing an involuntary petition to terminate parental rights. Rule 18(a) provides:

"*Petition.* The department for children and their families or any other agency authorized by law may petition the court for termination of legal rights of the parent or parents to a child. The petition shall set forth (1) to the extent known the name, age, and residence of (a) the child, (b) the child's parents, (c) the child's other legal guardian, (d) the person having custody and control of the child, and (e) the child's nearest known relative if no parent or guardian can be found; (2) a plain statement of facts on which the petition is based, including reference to the specific statutory grounds on which termination of parental rights is sought (the facts may be set forth in an affidavit accompanying the

---

**2.** Rule 14(b) of the Family Court Rules of Juvenile Proceedings provides: "[a] petition may be amended by order of the court at any time before an adjudication, [p]rovided [t]hat the court shall accord the party such additional time to prepare as may be required to ensure a full and fair hearing."

**3.** General Laws 1956 § 15–7–7(a)(2)(i) allows the court to terminate a parent's legal rights to a child when the parent is unfit by reasons of conduct or conditions seriously detrimental to the child, including:

"Institutionalization of the parent, including imprisonment, for a duration as to render it improbable for the parent to care for the child for an extended period of time[.]"

petition); (3) the action requested of the court by the petitioner. The petition shall be sworn to by an authorized agent of the petitioner on the basis of knowledge or information and belief before a justice or clerk of the family court or before a notary public."

The text of Rule 18(a) is silent on whether amendments are permissible before adjudication of trial or otherwise. We are confronted with the question of whether this silence amounts to a prohibition.

We hold that amendments to an involuntary petition for termination of parental rights are not prohibited, notwithstanding Rule 18(a)'s silence on the subject. Rule 33 of the Family Court Rules of Juvenile Proceedings provides in part that "[i]f no procedure is prescribed by these Rules, or by Rules of practice or general orders adopted pursuant to the authority contained in this Rule, the court shall proceed in any lawful manner not inconsistent with these Rules * * *." Therefore, the trial justice was free to proceed "in any lawful manner not inconsistent with these Rules" because no other rule prescribed a procedure that either allows or prohibits amendments to termination petitions.

In this case, the trial justice's permitting the amendment to the petition was lawful and consistent with other provisions in the rules. Amendments to petitions are explicitly permitted under Rule 14(b) in the context of petitions alleging abuse, neglect, or dependency. Further, as DCYF points out, we previously have recognized, at least implicitly, the applicability of the Rules of Procedure for Domestic Relations in termination proceedings. *See In re Christina V.,* 749 A.2d 1105, 1112 (R.I. 2000) (per curiam) (no good cause shown to subject child to another psychiatric evaluation under Rule 35(a) of the Family Court Rules of Procedure for Domestic Relations). Rule 15(b) of the Family Court Rules of Procedure for Domestic Relations, similar to its counterpart Rule 15(b) of the Superior Court Rules of Civil Procedure, allows for the amendment of pleadings at trial, and provides that the court "shall do so freely when the presentation of the merits of the action will be subserved thereby and the objecting party fails to satisfy the court that the admission of such evidence would prejudice the objecting party in maintaining his or her action or defense upon the merits."

In light of these considerations, we conclude that in allowing the amendment, the trial justice was proceeding in a "lawful manner not inconsistent with [the Rules of Juvenile Proceedings] or with any applicable statute," and was acting well within his discretionary authority. Fam. Ct. R. Juv. P. 33.

■ The respondent argues that he "was completely surprised by and prejudiced by the amendment," and that he would not have stipulated to the entry of the judgment of conviction had he been aware of the allegation. As even Fox acknowledges, however, the fact of his long incarceration was hardly a surprise to either Fox or his counsel. Moreover, we are not persuaded that the need to defend the termination petition on this basis was prejudicial. In the original petition, DCYF alleged that "there is not a substantial probability that the child will be able to return safely to the father's care within a reasonable period of time considering the child's age and the need for a permanent home." Obviously, the length of Fox's sentence to the ACI was a very relevant consideration with respect to this allegation, and not dissimilar to the amended allegation. If respondent felt that he needed additional time adequately to prepare a defense to the new allegation, he certainly was entitled to request a continuance. He did not do so, however.

Nor are we persuaded that Fox was prejudiced by his stipulation to enter the judgment of conviction into the evidence. We first note that although he clearly raised an objection, he never specifically moved to strike the judgment of conviction after the amendment was allowed. Moreover, the certified judgment of conviction was admissible under Rule 803(8) of the Rhode Island Rules of Evidence as a public record. It is inconceivable to us that in a Family Court proceeding bearing on the fitness of a father and the best interests of a child, that a properly authenticated judgment indicating that the father brutally assaulted and abused the child's cognitively impaired mother, would not be admitted into evidence.

The trial justice noted that DCYF moved to amend the petition "basically to conform to the evidence that had already been introduced," and concluded, "I don't think it came as any surprise to the respondent father in this case. I think his rights have been protected and will be protected." Nor do we detect any prejudice in allowing the amendment. The allegation that Fox would be incarcerated for a period sufficient to preclude him from caring for Isabella not only was supported by competent evidence, but also it was only one ground among four in the petition for termination, each of which required a finding that it was improbable that he would be able to care for the child either within a reasonable time or for an extended period. However, even if respondent was not adequately apprised of that specific allegation, he knew that evidence of his incarceration could be used to support the other grounds alleged in the petition.

The respondent does not cite any rule or statute that is inconsistent with the trial justice's ruling to amend the termination petition. Nor are we persuaded that Rule 18's silence on the issue of amendments amounts to a preclusion thereof. Rather, we conclude that the trial justice was acting well within his discretionary authority, and accordingly we affirm his ruling.

■ Next Fox contends that there was no evidence presented that he had an ongoing substance abuse issue that could not have been abated by treatment. He maintains that although he pled to a charge of possession of marijuana, he was holding it for another with no intent to use it himself. Furthermore, "that plea certainly does not establish an intractable and on-going substance abuse problem which would prevent reunification." However, respondent admits that two drug screens conducted pursuant to his required substance abuse evaluations were positive for cannabinoids. He also concedes that his substance abuse evaluation was not completed because of his incarceration.

General Laws 1956 § 15–7–7(a)(2)(iii) provides as follows:

"The child has been placed in the legal custody or care of the department for children, youth, and families and the parent has a chronic substance abuse problem and the parent's prognosis indicates that the child will not be able to return to the custody of the parent within a reasonable period of time, considering the child's age and the need for a permanent home. The fact that a parent has been unable to provide care for a child for a period of twelve (12) months due to substance abuse shall constitute prima facie evidence of a chronic substance abuse problem[.]"

We previously have defined "chronic" as: "[w]ith reference to diseases, of long duration, or characterized by slowly progressive symptoms; deep seated and obstinate, or threatening a long continuance * * *." *In re Suebun V.*, 766 A.2d 939, 943 (R.I. 2001) (per curiam) (quoting Black's Law Dictionary 241–42 (6th ed.1990)). Our re-

view of the evidence reveals that Fox admitted to occasional marijuana use up until age twenty-nine.[4] At the time of his psychological evaluation, he denied having used marijuana or any other unprescribed drugs in the previous year. He alleged that he was charged with marijuana possession because he was holding the drugs for a police officer who would have lost his job if he had been caught with the drugs. Despite his assertion that he had never consumed alcoholic beverages, Fox reeked of alcohol at one appointment with Dr. Parsons. When confronted by Dr. Parsons, he said that he had consumed the first beer in his life just one hour before their meeting. Furthermore, a report from his drug treatment and counseling provider revealed that two drug screens, on November 12, 2001, and December 11, 2001, detected the presence of marijuana in his system. The report also reveals that Fox missed a third screen. It is clear from the report and his plea to marijuana possession on October 19, 2001, that Fox continued to use marijuana at least up until a year after his daughter's birth. Based on an examination of the record, we conclude that the trial justice's finding that Fox had a chronic substance abuse problem clearly is supported by legal and competent evidence.

■ . Next, respondent argues that his incarceration "is not of such a duration as to render it improbable that he could care for Isabella for an extended period of time." We disagree. We previously have held that "[i]n order to be considered unfit pursuant to § 15–7–7(a)(2)(i) it is required that the '[i]nstitutionalization of the parent, including imprisonment, [is] of such a duration as to render it improbable for the parent to care for the child for an extended period of time.'" *In re Mercedes V.*, 788 A.2d 1152, 1153 (R.I.2001) (mem.).

We are mindful that parental rights should not be terminated solely because of conviction of a crime and a parent's subsequent incarceration; however, a parent's imprisonment may be considered along with other factors in deciding whether to terminate parental rights. *In re Frances*, 505 A.2d 1380, 1385 (R.I.1986).

We have further held that "the trial justice is not required to consider parole eligibility, he or she is only required to consider the probable duration of imprisonment at the time of the termination." *In re Mercedes V.*, 788 A.2d at 1153. In this case, the trial justice considered Fox's eligibility for parole in May 2002, and found that the possibility was "remote at the very best." Fox had served nearly four months of a five-year sentence and Isabella was already over a year old at the time of trial. She would be nearly six years old if her father completed a full sentence. We agree with the trial justice that Fox's incarceration and other grounds for termination indicated that there was not a substantial probability that Isabella would have been able to return to the care of her father within a reasonable period.

■ Finally, respondent argues that "the evidence did not clearly establish that, after the provision of reasonable services [Isabella's] return home with[in] a reasonable time was not substantially probable, pursuant to § 15–7–7[ (a)](3)." Specifically, Fox contends that none of the case plans provided for reunification with him, precluding DCYF from showing that it made reasonable efforts to reunify him with Isabella as a required condition precedent to the termination of his parental rights. In addition, he argues that the only services he received were the evaluation provided by. Dr. Parsons, and "perhaps" a psychiatric evaluation, "the results

---

4. Fox was born July 26, 1964.

of which were never revealed to the Court or to Mr. Fox or his counsel."

Section 15–7–7(a)(3) provides for the termination of parental rights when

"The child has been placed in the legal custody or care of the department for children, youth, and families for at least twelve (12) months, and the parents were offered or received services to correct the situation which led to the child being placed; provided, that there is not a substantial probability that the child will be able to return safely to the parents' care within a reasonable period of time considering the child's age and the need for a permanent home * * *."

We previously have held that "[r]easonable efforts toward reunification must be demonstrated by clear and convincing evidence and may be substantiated by attempts to provide the family with services, case plans, visitation, and furnishing the parent with information of the child's well being." *In re John W.*, 682 A.2d 930, 932 (R.I.1996) (per curiam) (citing *In re Kathaleen,* 460 A.2d 12, 14 (R.I.1983)). We also have noted that "reasonable efforts" is a subjective standard that requires a case-by-case analysis with attention given to the conduct and cooperation of the parents. *In re Nicole B.*, 703 A.2d at 618 (citing *In re Antonio G.,* 659 A.2d 672, 674 (R.I.1995) (per curiam)).

Here, three of the four case plans developed by DCYF, two of which respondent signed, specified a permanency plan goal of reunification with the mother. The goal of the fourth case plan, however, was adoption. Fox's caseworker, Joly–Sow, testified that he agreed to the goal of reunification with Castillo, and that he indicated that reunification with her mother would be best for Isabella.

At first, Fox refused to cooperate with DCYF, saying that he wanted only visitation with Isabella. DCYF provided Fox with supervised visitation, but it wasn't until he admitted to the allegation of neglect on May 25, 2001, more than six months after Isabella's birth, that he agreed to participate in treatment and services. On June 22, 2001, Joly–Sow referred Fox to Dr. Parsons for the psychological evaluation. Joly–Sow testified that in accordance with Dr. Parson's recommendations, she referred Fox to PACS for substance abuse counseling, to Dr. Halo for a psychiatric evaluation, and to Spurwink for parenting education. The domestic violence counseling was deferred until the criminal charges were resolved. The psychiatric evaluation was completed; the substance abuse counseling was not completed because of Fox's incarceration; and the "referral" to Spurwink, according to Joly–Sow, consisted of two telephone messages she left, neither one of which was returned. While he was incarcerated, the only services available to him were church and psychiatric services. Although, as Fox asserts, DCYF did not make any referral for services, other than to Dr. Parsons, for approximately five months after it was ordered to do so on May 25, 2001, there was also evidence that Fox had elected to undertake each service in succession. More significantly, however, it is clear from the record that the major impediments to the provision of reunification services were Fox's refusal to sign releases before May 25, 2001, and his incarceration after December 14, 2001. Both of these situations were at his own making. The trial justice's finding that DCYF showed by clear and convincing evidence that it made reasonable efforts to provide services is supported by legal and competent evidence.

More importantly, the department showed by clear and convincing evidence that Isabella could not safely be cared for by her father within a reasonable time

considering her age and need for a permanent home. There was no dispute that Isabella had been in the department's care for more than twelve months. The trial justice had ample evidence that respondent mistreated and physically abused his mentally ill and cognitively impaired pregnant companion; and further that he left her alone in his apartment, knowing that she had neither the ability nor the means to care for herself or a newborn in the event of delivery.

The record is awash with legal and competent evidence to support the trial justice's findings. As he succinctly and vividly summarized: "Return this child to the father? Not on a prayer. I would hesitate to place any kind of animal in this man's charge."

■ In termination cases, the Family Court must balance the interests of the state, the parents, and the child. *In re Ryan S.*, 728 A.2d 454, 457 (R.I.1999) (per curiam) (citing *In re Kenneth*, 439 A.2d 1366, 1369 (R.I.1982)). DCYF carried its burden "by clear and convincing evidence that it made reasonable efforts to encourage and strengthen the parental relationship * * * and that the parent is unfit." *Id.* (citing *In re Kristina L.*, 520 A.2d 574, 579 (R.I.1987)). Clearly, the trial justice was correct to find that Isabella cannot be safely cared for by her father within a reasonable period, considering her age and need for a permanent home. We are satisfied that the Family Court correctly balanced the interests of all parties and did what was in Isabella's best interest.

The good news for Isabella is that she is in a loving and supportive pre-adoptive home that promises to erase the trauma of her nearly tragic introduction to the world.

### Conclusion

For the foregoing reasons, we affirm the decree of the Family Court, to which we return the papers in this case.

Justice FLAHERTY did not participate.