**In re JEAN MARIE W. et al.**

**No. 88–262–A.**

Supreme Court of Rhode Island.

June 1, 1989.

Janet Gilligan, Dept. of Children and their Families, Shella Katz, Court Appointed Social Advocate, for plaintiff.

Catherine Gibran and Barbara Hurst, Asst. Public Defenders, for defendant.

## OPINION

SHEA, Justice.

This matter comes before the Supreme Court on appeal from a decision of the Providence County Family Court granting four petitions filed by the Department for Children and Their Families (DCF) on behalf of two infant sisters. The two initial petitions, filed by DCF on March 23, 1987, sought to remove the girls from the respondent-mother's custody on allegations of

abuse and neglect in violation of G.L.1956 (1984 Reenactment) chapter 11 of title 40, and G.L.1956 (1981 Reenactment) chapter 1 of title 14. The later two petitions, filed on June 2, 1987, further alleged that, by reason of her conduct, the respondent-mother was an unfit parent and requested the termination of her parental rights pursuant to G.L.1956 (1988 Reenactment) § 15–7–7.[1] By agreement of both parties the four petitions were consolidated for trial.

The Family Court granted DCF's petitions on February 5, 1988. The court ordered the children to be committed to the care and custody of DCF after finding that the mother had committed, or knowingly allowed to be committed, acts of sexual abuse, physical abuse, and neglect upon her daughters in violation of chapter 11 of title 40. The court further found the mother to be an unfit parent because of her cruel and abusive conduct toward the children and ordered the termination of her parental rights under § 15–7–7. We affirm.

Jean Marie, born November 16, 1982, and Veronica, born December 17, 1985, were aged four and one respectively, when their plight was first discovered by a Providence police officer on the morning of March 20, 1987. Responding to the mother's report of a break-in in progress, the officer arrived at her apartment to find two children, dirty and infested with lice and fleas, sleeping on a couch. The apartment itself had a heavy odor of urine and was littered with dirty clothes, garbage, used sanitary napkins, and drug paraphernalia—including caps to hypodermic needles, spoons for melting heroin or cocaine, and what appeared to be marijuana seeds. Further inspection of the premises revealed a broken toilet, a stove covered with rotting, insect-infested food, and an empty refrigerator.

After attending to the mother's complaint,[2] the officer informed her that owing

---

1. The statute in force at the time this case was filed, G.L.1956 (1981 Reenactment) § 15–7–7, as amended by P.L.1984, ch. 204, § 3, was amended by the 1988 Reenactment. However, although the 1988 Reenactment substantially rearranged and renumbered the paragraphs, no substantive changes were made to the text of the statute. For the purpose of clarity we will refer to § 15–7–7 in its 1988 Reenactment format.

2. The reported break-in was actually nonexistent. The mother had called the police to remove three unwanted overnight guests whom she could not get to leave.

to the condition of the children and the apartment he was going to take the two girls to the hospital. Both children were then taken to the Rhode Island Hospital Pediatrics Clinic for examination.

At the hospital Jean Marie was uncooperative and would not allow a full physical examination. She did, however, allow several lab tests that indicated that she suffered from chlamydia and gonorrhea, two sexually transmitted diseases. A full physical examination of Veronica revealed signs of head lice and fleas and indicated that she was markedly developmentally delayed for her age. Lab tests indicated that Veronica also suffered from chlamydia and showed the presence of cocaine metabolites in her urine.[3]

While at Rhode Island Hospital, Jean Marie was also evaluated by a child-life specialist who observed her play with anatomically correct dolls.[4] During her play with the dolls, whom she referred to as "Gary," "mommy," and "me," Jean Marie showed "Gary," an adult male doll, engage in various oral, anal, and vaginal sex acts, involving penile and digital penetration, with the "me," female child, doll while in the presence of the "mommy" doll. Jean Marie also showed the "Gary" doll hitting the "me" doll. The child-life worker recorded her observations and submitted them to the examining physician.

Relying on the results of his examinations of the children, the background provided by the police, the lab reports, and the child-life worker's report, the examining physician diagnosed both children as victims of child abuse and filed a report placing the girls in DCF custody for seventy-two hours. Later that day DCF placed the children with a foster mother.

During the children's stay in foster care their foster mother observed that Veronica

was particularly unresponsive and uncoordinated for her age and that Jean Marie was afraid to go to sleep and had frequent nightmares. After two days the foster mother noticed while bathing Jean Marie that her vagina looked extremely irritated. The girl told her foster mother that her vagina and rectum hurt, that the "black monster" did it to her, and that he had a knife and was going to kill her. The following morning Jean Marie spontaneously told her foster mother that she was "tired of them guys putting them dicks in my mouth and in my coo-coo"[5] and that "them guys" hurt her bad. She also revealed that "the black monster" was not a monster but a black man who had "humped" her and made her pregnant. Jean Marie told her foster mother that she had a baby in her tummy.

On March 23, 1987, Jean Marie's foster mother took her to Kent County Hospital after discovering an abnormal vaginal discharge in the child's underwear. This time, after some persuasion, Jean Marie reluctantly allowed a pelvic examination. Upon his examination the physician observed a reddening around the child's vaginal opening and a foul smelling, purulent discharge. Specimens of the discharge revealed gonococcal vaginitis, otherwise known as gonorrhea. Relying on his observations, the background provided by the foster mother, and statements that Jean Marie had made to him regarding a man who had oral and vaginal intercourse with her, the doctor diagnosed sexual molestation.

The following day the foster mother returned to Kent County Hospital to have Veronica examined. This examination, conducted by yet another doctor, revealed that the child had a punctured hymen and bruising to her urethra and the left fold of her

---

3. Cocaine metabolites are the chemical byproducts produced when the liver and kidneys breakdown cocaine. Even though cocaine may not be present in the body in its original form, the presence of these chemicals in the urine is a positive indication of cocaine ingestion or injection.

4. Jean Marie was given four anatomically correct dolls: one adult male, one adult female, one child male, and one child female. During her play both adult dolls and the female child doll were used. The male child doll was ignored completely.

5. "Coo-coo" is Jean Marie's term for vagina.

labia.[6] This doctor also diagnosed sexual molestation.

In May of 1987 DCF referred Jean Marie to the East Side Center in Providence for a three-day evaluation by a registered, independent clinical social worker. The social worker observed Jean Marie at various types of play. At one session, in which the child was allowed to develop her own play, Jean Marie repeatedly played out a violent, make-believe scene about a man with a knife trying to kill her baby. At another session, in which the child was given a family of anatomically correct dolls to play with, Jean Marie showed that she was familiar with common slang terms for both the male and female genitalia and spontaneously positioned the dolls in various sexually explicit positions while making comments such as "they are humping" and "most of the time he sticks it in the mouth." Relying on her observations and background information provided by DCF, the social worker diagnosed sexual abuse.

Relying on the testimony and evidence received at trial, the Family Court justice found that the mother had inflicted, or allowed to be inflicted, upon her children physical injury and sexual abuse and that the children were without proper parental care and supervision. He further found the mother to be an unfit parent and terminated her parental rights.

The first issue raised on appeal asserts that the Family Court justice erred in admitting the testimony of five witnesses. The mother argues that this testimony constituted inadmissible hearsay because it introduced her daughter's out-of-court statements and other assertive conduct to prove the truth of what they asserted without falling within any recognized exception to the hearsay rule.

The mother's first hearsay objections involve the testimony of two witnesses regarding their observations of Jean Marie's play with anatomically correct dolls. These witnesses, the child-life worker from Rhode Island Hospital and the social worker from the East Side Center, were qualified as experts and testified to Jean Marie's verbal and nonverbal conduct during her play with the dolls.[7] In overruling the mother's hearsay objections, the Family Court justice ruled that the testimony was not hearsay pursuant to Rule 801(c) of the Rhode Island Rules of Evidence because it had been offered to prove something other than the truth of the matter asserted, namely, Jean Marie's explicit sexual knowledge.

Statements not offered to prove the truth of what they assert are not hearsay and as such do not require the assistance of an exception to the hearsay rule in order to be admissible. *Gordon v. St. Joseph's Hospital*, 496 A.2d 132, 136 (R.I. 1985); *see also McCormick on Evidence* § 249 (3rd ed. Cleary 1984). Accordingly we find that expert testimony to the verbal and nonverbal conduct of children made during the course of their play with anatomically correct dolls is admissible for nonhearsay purposes if offered to prove something other than the truth of the matter asserted thereby. *In the Interest of M.E. and L.E. v. M.E.E.*, 715 S.W.2d 572, 574–75 (Mo.Ct.App.1986). In this case Jean Marie's actions were not offered to prove that she was actually molested. Rather her verbal and nonverbal conduct was offered to show that she had explicit sexual knowledge—involving anal, oral, and vaginal sexual intercourse—far in advance of the knowledge of a normal four-year-old. *See id.* at 575. Therefore, we find that the Family Court justice properly admitted the testimony of these experts as nonhearsay.

Next the mother argues that the Family Court justice erred in admitting the testimony of three witnesses under the medical-diagnosis exception to the hearsay

---

6. The hymen is a thin membrane that normally covers nearly the entire entrance to the vagina in a virgin. The urethra is the end of the urinary tract where urine is excreted. The labia are the fleshy outer folds of the female genitalia that cover and protect the vagina.

7. The admissibility of the remainder of the social worker's testimony, that which did not involve the child's play with anatomically correct dolls, is discussed separately as it relates to the medical-diagnosis exception to the hearsay rule. R.I.R. Evid. 803(4).

rule. R.I.R. Evid. 803(4). The mother contends that this testimony—offered by the social worker and two physicians who diagnosed Jean Marie's condition—fails to meet the requirements of the medical-diagnosis exception because the statements narrate details unconnected with either diagnosis or treatment. *State v. Lima,* 546 A.2d 770 (R.I.1988), and *State v. Pina,* 455 A.2d 313 (R.I.1983). We disagree.

In *Pina,* a case involving only the issue of whether intercourse was consensual, this court found that a doctor's statements about defendant's alleged threats merely acted to assign fault by commenting on the issue of consent; therefore, the statements were not pertinent to diagnosis and were not admissible under the medical-diagnosis exception to the hearsay rule. *Pina,* 455 A.2d at 315. Similarly in *Lima* we found a father's statements to his child's physician, claiming that a babysitter had submerged the child in hot water, to be inadmissible as tending to fix fault. *Lima,* 546 A.2d at 774. The present case is distinguishable in that Jean Marie's statements were used to establish that sexual abuse had actually occurred but did not act to fix fault on any party in interest.

Both the doctors and the social worker who had examined Jean Marie testified that they had relied, in some part, on statements made by the child in formulating their diagnosis. The first doctor to see Jean Marie testified that he had relied in part on the report of the child-life worker who heard the child's statements and observed her conduct in formulating his diagnosis. The second doctor to see Jean Marie testified that his diagnosis was partially based on the child's statements to him about being in bed with her mother and her mother's boyfriend while another man performed sexual acts on her. Finally the social worker testified that her diagnosis was based on her observations of Jean Marie's verbal and nonverbal conduct over a three day evaluation period.[8]

The medical-diagnosis exception to Rhode Island's hearsay rule allows for the admission of "[s]tatements made for purposes of medical diagnosis or treatment and describing * * * the inception or general character of the cause or external source thereof insofar as reasonably pertinent to diagnosis or treatment." R.I.R. Evid. 803(4). The statements do not have to be made to a physician, Advisory Committee's Note to Rule 803(4); rather their admissibility "hinge[s] on whether what has been related by the patient will assist or is helpful in the diagnosis or treatment of his ailment." *State v. Ucero,* 450 A.2d 809, 815 (R.I. 1982)(quoting *State v. Contreras,* 105 R.I. 523, 534-35, 253 A.2d 612, 619 (1969)). Thus we find that the testimony was properly admitted under this exception.

■ The mother's final hearsay objection is to the testimony of the foster mother. The respondent-mother contends that the foster mother's testimony in respect to statements made by Jean Marie was hearsay that was improperly admitted under G.L.1956 (1981 Reenactment) § 14–1–69, as enacted by P.L.1985, ch. 381, § 1.

Under § 14–1–69 the Family Court may, in its discretion, permit as evidence

"any statement by a child under the age of thirteen (13) years old about a prescribed act of abuse, neglect or misconduct by a parent or guardian, if such statement was made spontaneously within a reasonable time after the act is alleged to have occurred, and if the statement was made to someone the child would normally turn to for sympathy, protection or advice."

The mother argues that although the foster mother was a person to whom Jean Marie would normally turn to for sympathy, her daughter's statements were neither spontaneous nor were they made with-

8. Contrary to the mother's arguments, we find that the Family Court justice was properly within his discretion in allowing this witness to render a diagnosis based on her status as a *registered,* independent clinical social worker pursuant to G.L.1956 (1987 Reenactment) chapter 39 of title 5. Her extensive formal education and practical experience in the field of child social work also support this decision. Accordingly, this witness was free to testify to those hearsay statements that were reasonably pertinent to her formulation of a diagnosis. R.I.R. Evid. 803(4).

in a reasonable period after the alleged incidents of abuse supposedly occurred. We disagree.

"The mother's arguments fail to recognize that relaxed standards of spontaneity and timeliness apply to hearsay proffered under § 14–1–69." *In re Deborah M.*, 544 A.2d 572, 574 (R.I.1988). In relaxing these standards, the Legislature replaced the requirement that the declarant be "laboring under the stress of nervous excitement" with the requirement that the hearsay statement be "made to someone the child would normally turn to for sympathy, protection or advice." *Id.* (quoting *State v. Creighton*, 462 A.2d 980, 982 (R.I.1983) and § 14–1–69); *see also In re Thomas V.*, 540 A.2d 1027 (R.I.1988). This change, in effect, created a new, relaxed excited-utterance exception to the hearsay rule specifically designed for the young child-witness. Compare Rule 803(2) with § 14–1–69 (Rule 803(2) requires that a statement be made "under the stress of excitement," while § 14–1–69 requires only that the statement be made "within reasonable time").

■ In the present case we find that Jean Marie's statements were both timely and spontaneous within the standards of § 14–1–69. The statements complained of were made to her foster mother within three days of being placed in foster care, a reasonable time from when she was removed from the scene of her abuse. " 'Generally speaking, a less demanding time requirement is necessary in sexual-offense cases, particularly when the victim is a child of tender years.' " *In re Deborah M.*, 544 A.2d at 575 (quoting *State v. Creighton*, 462 A.2d at 982)(four days between time of incident and time of statement held to be not too remote). This short lapse in time can be reasonably attributed to Jean Marie's need to adapt to her new surroundings and caretaker so as to feel secure in telling her story. Furthermore Jean Marie's unprovoked monologue regarding her abuse was sufficiently spontaneous and impulsive to meet the requirements of § 14–1–69. The mother's arguments that some of the statements testified to were not spontaneous because they were made in reference to inquiries made by the foster mother are without merit. Even under the stricter standards of admissibility required by the excited-utterance exception to the hearsay rule, the fact that a statement was made in response to an inquiry does not render the statement inadmissible. *State v. Burns*, 524 A.2d 564, 567 (R.I.1987); *State v. Creighton*, 462 A.2d at 982.

■ The mother's second major argument on appeal contends that the Family Court justice improperly excluded exculpatory videotaped interviews of Jean Marie. These interviews, conducted and filmed by DCF in June of 1987, allegedly contained footage of Jean Marie contradicting many of the statements other witnesses claim she made regarding her abuse. The mother argues that these tapes should have been admitted pursuant to § 14–1–68, as enacted by P.L.1985, ch. 379, § 1, which permits the use of videotaped testimony of child witnesses. Alternatively, the mother claims that these tapes are admissible pursuant to Rule 806 to attack the credibility of the declarant's previously admitted hearsay statements. Even though we find these claims have some merit, we do not find that they constitute reversible error.

Under § 14–1–68, a DCF videotape recording of an interview or statement made by a child is admissible in any court proceeding where the declarant-child is the subject of a petition filed by DCF, provided that it is relevant and material and that its probative value substantially outweighs its prejudicial effect. However, before such a tape is admissible, seven specific requirements must be met. One of these requirements, that the taped statement be sworn to under oath, § 14–1–68(1), was not satisfied in the present case, thus leading the Family Court justice to find the tapes inadmissible under the statute.

The mother argues that since these requirements serve to protect the person against whom they were intended to be used—usually the child's parent or parents—a parent wishing to introduce such tapes as part of his or her defense should be able to waive these requirements. However,

even though this argument would seem to be a logical extension of the intent behind § 14-1-68 and might support a trial justice's decision to allow such a use of a videotaped interview, we cannot find reversible error in the Family Court justice's application of § 14-1-68 given the statute's unambiguous language:

> "Prior to the videotaped recording being introduced into evidence *the court shall first determine that:* (1) the statement is sworn to under oath by the child and the significance of the oath is explained to the child." (Emphasis added.)

■ The mother's argument that the videotapes should have been admitted pursuant to Rule 806 likewise is a credible argument; however, it too falls short of constituting reversible error. According to Rule 806:

> "When a hearsay statement, or a statement defined in Rule 801(D)(2), (C), (D), or (E), has been admitted in evidence, the credibility of the declarant may be attacked, and if attacked may be supported, by any evidence which would be admissible for those purposes if declarant had testified as a witness. Evidence of a statment [statement] or conduct by the declarant at any time, inconsistent with the declarant's hearsay statement, is not subject to any requirement that the declarant may have been afforded an opportunity to deny or explain."

Under this rule, the Family Court justice's belief that "the alleged [prior inconsistent] statement has to be brought to the attention of the witness" was incorrect. Even though some uses of prior inconsistent statements do contain such a requirement, *see* Rule 613, no such requirement is called for under Rule 806. Therefore, the videotapes should have been found admissible.

However, even though this evidence was mistakenly excluded, we find no reversible error in the judge's decision for two reasons. First, the Family Court justice found the tapes to be of poor quality, difficult to understand, and lacking any real probative value. Second, Jean Marie's testimony in court was just as inconsistent with the hearsay testimony offered by the other witnesses as were the videotapes; thus, the admission of the tapes simply would have been cumulative in nature.

■ The mother's final issue on appeal is that the Family Court justice erred in finding that DCF was not required to make any efforts to rehabilitate her and reunite her with her children. Again we disagree.

The petitions to terminate the mother's parental rights were filed and granted pursuant to § 15-7-7(1)(b)(ii), finding that she was an unfit parent by reason of conduct toward her children of a cruel and abusive nature. Under § 15-7-7(2)(a) any agency filing a termination petition pursuant to subsections (1)(a), (1)(b)(i), or (1)(b)(iii) must show that it made reasonable efforts to encourage and strengthen the parental relationship. However, no such condition exists for petitions filed under subsection 1(b)(ii).

In addition, § 15-7-7(3) states that "[i]n considering the termination of rights as pursuant to subsection (1), the court shall give primary consideration to the physical, psychological, mental, and intellectual needs of the child * * *." In reviewing the facts of this case, we find the decision of the Family Court justice to be properly within the language of subsections (1)(b)(ii), (2)(a), and (3). The facts before this judge showed that both Jean Marie and Veronica suffered from sexually transmitted diseases and other physical manifestations of sexual abuse and neglect. In addition, Veronica at fourteen months old tested positively for cocaine metabolites, and Jean Marie at four years old had explicit sexual knowledge of anal, oral, and vaginal intercourse. Yet despite the fact that the mother told a police investigator that she stayed with her children twenty-four hours a day, except for Saturday nights, she was unable to offer any explanation of how her children came to be in the condition in which they were found by the police. In *In re Frances*, 505 A.2d 1380, 1384–85 (R.I.1986), this court affirmed a decision to terminate parental rights without reunification efforts in similar circumstances. In that case we affirmed a termination proceeding pursuant to § 15-7-7(1)(b)(ii) where the

mother, after denying that she had ever left her child with anyone else, was unable to explain adequately her child's injuries, which were determined to have occurred over time. 505 A.2d at 1384.

We agree with the Family Court justice's decision to terminate the mother's parental rights without requiring DCF to make efforts at reunifying her with her children. The evidence supporting the termination was clear and convincing, and the atrociousness of the abuse suffered by these children of such tender years indicates that the slightest concern for their physical and psychological well-being would dictate that these children not be returned to such an environment.

For these reasons the mother's appeal is denied and dismissed, the decision of the Family Court is affirmed, and the papers of the case are remanded to the Family Court.