April 30, 2026

**Supreme Court**

No. 2025-22-C.A.
(P1/20-1751A)

(Concurrence begins on Page 18)

| | |
|---|---|
| State | : |
| v. | : |
| William Gilbert. | : |

NOTICE: This opinion is subject to formal revision before publication in the Rhode Island Reporter. Readers are requested to notify the Opinion Analyst, Supreme Court of Rhode Island, 250 Benefit Street, Providence, Rhode Island 02903, at Telephone (401) 222-3258 or Email opinionanalyst@courts.ri.gov, of any typographical or other formal errors in order that corrections may be made before the opinion is published.

|  |  |
|---|---|
| State | : |
| v. | : |
| William Gilbert. | : |

Present: Suttell, C.J., Goldberg, Robinson, Lynch Prata, and Long, JJ.

**O P I N I O N**

**Chief Justice Suttell, for the Court.**  The defendant, William Gilbert, appeals from a Superior Court judgment of conviction after having been found guilty by a jury of first-degree sexual assault in violation of G.L. 1956 § 11-37-2.  On appeal, the defendant contends that the trial justice erred in allowing into evidence statements that the defendant's roommate made to the complainant after the assault, arguing that the testimony was impermissible hearsay.   For the reasons set forth in this opinion, we affirm the judgment of the Superior Court.

**I**

**Facts and Travel**

The complainant testified to the following.  She was thirteen years old when the Department of Children, Youth and Families (DCYF) became involved in her

- 1 -

life.  DCYF removed her from her mother's care sometime around 2016,[1] and for the next several years, she stayed in various homes.  Initially, she lived with a friend's grandparents; however, DCYF eventually sought to have her placed in a group home.  The complainant had never been to a group home before and was afraid of going because she had heard that "it's tough to live there and a lot of bad things happen there."  She only stayed for about eleven hours; and after her swift departure, she was "on the run."  During this time, she lived with an aunt, various friends, and in June 2018, went to live with her grandmother.

Soon thereafter, the complainant's grandmother contacted DCYF because she could no longer care for the complainant.   She then went to stay with another one of her aunts, where she met with her DCYF social case worker.  The complainant testified that she told the case worker that she would run again because "[she] was too scared to be in a group home."  When the case worker said that she would have to call the police, the complainant did in fact run away.

The complainant stated that she knew she could not stay with her aunt because "[t]he police and DCYF were aware of her [aunt's] house being somewhere where

---

[1] Erin Wertheimer, a social case worker for DCYF at the relevant time, testified that she "began working with [the complainant's] family around the year 2016[,]" and at the time she received the case, the complainant was in DCYF custody and "her mother's rights were in the process of being terminated."  When asked when DCYF sought to place the complainant in a group home, the complainant testified "[i]t was 2016, I believe. Maybe 2017."

[she] might have gone, so [she] didn't want to go back over there." A few days later, her aunt took her to defendant's apartment. The complainant testified that defendant was a family friend; and, although she had never met him before, "[her] aunt trusted him, so [she] trusted it."

The defendant lived in a two-bedroom apartment in Cranston with his two children and an adult roommate, David Diluglio. The defendant's children each occupied one room, and defendant and Diluglio slept in the living room. When the complainant first began staying at the apartment, she slept on a couch in the living room. Shortly after her arrival, however, defendant's children went to live with their mother; and at that point, defendant told the complainant that she could sleep in one of their bedrooms. She testified that at this time it was going well, and she felt safe. She did not spend much time alone with either defendant or Diluglio because she typically had friends come over to the apartment to hang out with her.

The complainant testified that she had been staying in the apartment for a few weeks when the assault occurred; specifically, she recalled that it was a couple of weeks after her sixteenth birthday on July 31, 2018. On the night of the assault, around midnight, she asked defendant if he could give her a ride to "go get weed and then pick up [her] boyfriend at the time." They drove to India Point Park in Providence to obtain the marijuana. She testified that on the way she was mostly texting her boyfriend to see if he was ready to be picked up. After they acquired the

marijuana, she was still waiting for her boyfriend to answer her messages. The defendant told her that he needed to stop at a friend's house to "grab something." The complainant recalled that defendant pulled into a parking lot behind a building that had a business on the first floor and apartments on the top floor, leading her to believe that she was in the Thayer Street area of Providence. She recalled that there was no one in the parking lot and the area was not lit. They were there for approximately twenty to thirty minutes, and she was tired, so she placed her head on the window looking outwards.

Next, the complainant recalled "[feeling] something hard and cold touch [her] head * * *." When she turned, she saw that defendant was holding a gun to her. She stated that defendant told her to pull her pants down; she added that she tried to open the door and get out of the car, but he climbed on top of her and slammed the door shut. The defendant told her that if she screamed or left, he would "knock [her] out and bring [her] to a pimp's house."

She testified that "[h]e told me to pull my pants down again, and I refused, so he did it himself, and -- he used his hands to force himself inside of me." By this, she specified that defendant forced his penis into her vagina. She testified that while this was happening, he "was touching my breasts and kissing my neck and he told me that I'm a big girl and I can take it." The complainant stated that she was crying and kept telling defendant to get off her, and after a few minutes he "just randomly

- 4 -

stopped and got off, [and] went back into the driver's seat." He told her not to tell anyone, and they drove back to the apartment in silence.

When they returned to the apartment, no one else was there, and defendant fell asleep on the couch in the living room. The complainant testified that she immediately locked herself in the bathroom and took a shower. When she was done, she messaged her boyfriend and told him what had happened.[2] She stated that she did not leave the apartment that night because she was scared; she knew that defendant had a gun and "he had told [her] not to leave before, so [she] wasn't going to risk it then."

In the morning, Diluglio came back to the apartment, and the complainant asked if she could talk to him. Her testimony as to their ensuing interaction was as follows:

> "[Prosecutor:] * * * Now, when you saw Dave in the house, what did you do?
>
> "[Complainant:] I asked him if I could talk to him.
>
> "[Prosecutor:] What did he say?
>
> "[Complainant:] He said yeah.

---

[2] At trial, the state sought to introduce as a full exhibit screenshot photographs of messages the complainant alleged to have sent to her boyfriend immediately following the assault. The screenshots were believed to be taken from the complainant's phone by a detective at the Cranston police station. Concerned with their legibility and finding that the foundation had not been properly laid, the trial justice sustained defendant's objection and excluded the evidence.

"[Defense Counsel]: Objection.

"THE COURT: Overruled.

"[Complainant:] He said yeah. He took me out into the hallway.

"* * *

"[Prosecutor:] How were you feeling at that point?

"[Complainant:] Still anxious and scared.

"[Prosecutor:] What did you do at that point?

"[Complainant:] I told him what had happened to me.

"[Prosecutor:] How did he react to you?

"[Complainant:] He started crying, and he told me that --

"[Defense Counsel]: Objection.

"THE COURT: Overruled. The answer may stand. Put another question.

"[Prosecutor:] What did Dave do?

"[Complainant:] He told me that I needed to leave.

"[Defense Counsel]: Objection.

"THE COURT: Overruled. You may answer.

"[Complainant:] He told me that I needed to leave and that I should get out of there as soon as possible."

- 6 -

At that point, she texted her mother and then waited for someone to get back to her. Her mother, cousin, and boyfriend eventually came to get her. She told them what had happened to her, however she begged them not to tell anyone or go to the police. She stated that she knew if they went to the police that she would end up in a group home.

After she left the apartment, the complainant went to stay at her cousin's friend's house. She testified she was on the run for almost two more years. DCYF eventually located her, from an anonymous tip, at an apartment in Massachusetts in January 2020. The complainant told them that she wanted to "report something that had happened to [her] when [she] was on the run." A few days later, she was taken to the Cranston police station, where she made a statement.[3] When asked why she waited until that time to tell police what happened, she stated that "I made a promise to myself and my mom that I would report it the second I wasn't on the run anymore."

Detective Koren Garcia of the Providence Police Department testified that the complainant informed her that she told Diluglio what happened immediately after the assault and that there were messages sent by the complainant to her boyfriend at

---

[3] The complainant asked to be taken to the Cranston police station; however, after she revealed to police that she believed the incident occurred in Providence, they brought in Providence police. She made a formal recorded statement in the presence of a Cranston police officer, then had an informal conversation with Detective Koren Garcia of the Providence Police Department.

that time that she was able to access on her phone. Detective Garcia saw the messages; and, while she did not recall the exact date, she testified that she saw a date on them and believed it was August 2018. An investigation followed.

On June 15, 2020, a grand jury returned an indictment charging defendant with one count of first-degree sexual assault. A trial by jury was held in the Superior Court from April 24 to 26, 2023, and defendant was thereafter convicted. He was sentenced to fifty years, twenty-five to serve and twenty-five suspended, with probation. The defendant timely appealed to this Court.

## II

### Standard of Review

"It is well established that decisions concerning the admissibility of evidence are within the sound discretion of the trial justice, and this Court will not interfere with the trial justice's decision unless a clear abuse of that discretion is apparent." *State v. Alves*, 183 A.3d 539, 542 (R.I. 2018) (quoting *State v. Adams*, 161 A.3d 1182, 1194 (R.I. 2017)). "The trial justice will not have abused his or her discretion as long as some grounds supporting his or her decision appear in the record." *Id.* (quoting *Adams*, 161 A.3d at 1194).

## III

## Discussion

The defendant advances one argument on appeal: the trial justice erred in admitting the complainant's testimony regarding the conversation she had with Diluglio the morning after the alleged assault. Specifically, defendant points to the complainant's testimony that, after she told Diluglio what had happened, he started crying and "told [her] that [she] needed to leave[,]" adding further that he "told [her] that [she] needed to leave and that [she] should get out of there as soon as possible."[4] The defendant argues that the complainant's statements about what Diluglio told her were inadmissible hearsay offered for their truth, that being "to show that [the complainant] needed to leave the apartment right away because [he] believed she had been sexually assaulted by [defendant] * * *."

Additionally, defendant contends that the admission of these statements was not harmless error because it was the only evidence that the complainant had made a contemporaneous disclosure of the incident, corroborating and lending credibility

---

[4] In its papers, the state relates the complainant's observation and testimony that Diluglio cried to demeanor evidence, not hearsay, asserting that "[h]er direct observations of Mr. Diluglio's demeanor did not stand for any out-of-court statement from the declarant – because there was no statement." The defendant refutes this contention in his reply brief; however, at oral argument counsel stated that defendant was not challenging the specific testimony that Diluglio cried.

to her allegations. The defendant maintains that "[t]he jury should have been able to draw its own conclusions about how to interpret [the complainant's] delayed disclosure and the fact no other witness testified to anything that happened near-in-time to the alleged assault."

The state argues, preliminarily, that the issue is waived, as defendant did not sufficiently preserve it for appellate review. By simply stating "objection," without articulating the grounds for such, the state contends, defendant's objections lacked the specificity required to properly bring it before this Court. The defendant disagrees, maintaining that it was clear from the context of the testimony that the grounds for the objections were hearsay, and as such, under Rule 103(a)(1) of the Rhode Island Rules of Evidence, a specific basis was not required.

"This Court has 'repeatedly indicated that it adheres to what is commonly called the raise or waive rule—*i.e.*, we do not consider issues on appeal which were not raised and properly presented during proceedings in the court below.'" *State v. White*, 296 A.3d 692, 702 (R.I. 2023) (quoting *DeMarco v. Travelers Insurance Company*, 26 A.3d 585, 628 (R.I. 2011)). "Furthermore, when an evidentiary issue is raised on appeal, Rule 103(a)(1) of the Rhode Island Rules of Evidence explicitly provides that a finding of error must be based upon 'a timely objection or motion to strike * * * of record, stating the specific ground of objection, if the specific ground

- 10 -

was not apparent from the context.'" *State v. Colon*, 198 A.3d 1249, 1258 (R.I. 2019) (emphasis omitted) (quoting *State v. Feliciano*, 901 A.2d 631, 646 (R.I. 2006)).

Upon review, we are satisfied that the grounds for defendant's objections were readily apparent from the dialogue between the prosecutor and the complainant. During the complainant's testimony recounting her interaction with Diluglio, counsel for defendant objected three times. Although in each instance counsel only stated "objection[,]" without specifying the grounds, she did so immediately following the complainant's statements that began "[h]e said" or "[h]e told me that." It is evident that this language introduces reported speech, and thus, is likely to spawn a hearsay statement.

Additionally, defendant's second objection was made after the prosecutor inquired, "How did he react to you?" and the complainant answered, "He started crying, and he told me that --[.]" The trial justice then responded, "Overruled. The answer may stand. Put another question." We have stated that "[t]he central principle of Rule 103(a)(1) rests on the premise that a trial justice may infer the specific grounds of an objection, even when an objecting party does not make those grounds clear." *State v. Barros*, 148 A.3d 168, 174 (R.I. 2016). We have no doubt that the trial justice understood each of defendant's objections in this colloquy to be made on hearsay grounds, and we note that this is further evinced by his assertion directing the prosecutor to "[p]ut another question." Thus, it is our opinion that, in this case,

the grounds of hearsay could be properly inferred from the context of the complainant's testimony. Accordingly, the issue has not been waived.

The state further responds that, even if the issue were properly preserved for our review, the trial justice did not err in admitting the testimony because it was not offered for the truth of the matter asserted and, accordingly, was not hearsay. Instead, the state argues that the statements were used for their effect on the listener, to explain why the complainant left the apartment the day after the alleged assault. The state cites two cases in which this Court held that the admission of out-of-court statements offered, not for their truth but to explain the witness's subsequent act, were not abuses of discretion. *See State v. Peckham*, 338 A.3d 1064, 1078-79 (R.I. 2025) (determining that a witness's statement that he overheard the declarant say he had a gun was not offered for its truth, but to show what prompted him to quickly drive away from the house he was parked in front of moments before the shooting); *State v. Oliveira*, 127 A.3d 65, 83 (R.I. 2015) (stating that an officer's testimony regarding what the complainant told his mother was not hearsay because the purpose of the testimony was to explain why the officer urged the complainant's mother to take him to the hospital).

The defendant disagrees, arguing that the state's explanation is unpersuasive because (1) no explanation was needed as to why the complainant left the apartment as it was evident that "a teenager with a history of running away [] would flee the

- 12 -

apartment of someone who raped her at gun point[,]" (2) the state's now proffered reason was not its actual use at trial, and (3) the statements did not actually prompt the complainant to leave the apartment. Further, defendant attempts to distinguish the present facts from *Peckham* and *Oliveira* by again asserting that, contrary to those cases, no reason was needed for why the complainant left the apartment, and that there was no other permissible use for Diluglio's statements at trial besides their truth. We cannot agree.

"Hearsay evidence is a statement, other than one made by the declarant while testifying at a trial or hearing, offered in evidence to prove the truth of the matter asserted." *In re J.R.*, 336 A.3d 42, 56 (R.I. 2025) (quoting *State v. Lynch*, 854 A.2d 1022, 1030 (R.I. 2004)). However, "an out-of-court statement that is not offered for the truth of the matter asserted but for some other purpose—such as to show notice or the effect of the statement upon the listener—is not hearsay." *Oliveira*, 127 A.3d at 82. Statements that are not hearsay "do not require the assistance of an exception to the hearsay rule in order to be admissible." *State v. Gomes*, 764 A.2d 125, 131 (R.I. 2001) (quoting *In re Jean Marie W.*, 559 A.2d 625, 629 (R.I. 1989)). "It is axiomatic that an out-of-court statement is not hearsay unless it is offered for the truth of the matter asserted." *Id.* (quoting *State v. Johnson*, 667 A.2d 523, 530 (R.I. 1995)).

- 13 -

At the outset, we seek to address defendant's assertion that the "truth" of Diluglio's statements to the complainant was that "[the complainant] needed to leave the apartment right away because [he] believed she had been sexually assaulted by [defendant] * * *." While the intent of Diluglio's statements may well have been that he believed she needed to leave, we are unconvinced that this was because he believed defendant assaulted her. In our view, it is equally plausible that Diluglio urged the complainant to leave the apartment for a host of other reasons. For example, this may have been because he did not want her to call the police or simply no longer wanted her to stay there. Diluglio was not only defendant's friend but was also living in defendant's apartment both prior to and at the time of the alleged assault. In contrast, the complainant had only been staying at the apartment for a few weeks and testified herself that she did not spend much time with Diluglio while she was there.

Even assuming that the truth of Diluglio's statements to the complainant was that she needed to leave because he believed defendant had assaulted her, we do not agree that it was offered for that purpose. In arguing that Diluglio's statements were not offered to explain their effect on the complainant, prompting her to leave the apartment, defendant makes much of the fact that she was a "teenager with a history of running away" and "no explanation was needed" as to why she left defendant's apartment the day after the alleged assault. Our review of the record tells a different

- 14 -

story. Admittedly, the complainant fled from several homes after DCYF became involved in her life. However, she did so only to evade DCYF care, as she was adamant that she did not want to be placed in a group home.

In fact, in every instance in which the complainant was staying with a friend or family, she ran away only under the threat of being forcibly removed from that home by DCYF, whether that be because the friend or family member housing her could no longer care for her or because it was not a proper placement for her to begin with. This is further evidenced by her testimony that once she did leave defendant's apartment, she begged her mother and boyfriend not to go to the police, as she was terrified that police involvement would place her back into DCYF care and a group home. She testified that she made a promise to herself and her mother that she would report the assault only when she was no longer on the run from DCYF.

Additionally, the complainant testified that she was still scared in the hours immediately following the assault, and that she did not leave the apartment that night because she knew that defendant had a gun and because "he had told [her] not to leave before, so [she] wasn't going to risk it then." Thus, it is not apparent to us, as defendant advances, that "no explanation was needed for why [the complainant] left the apartment" or that this was not the true reason why the state sought to elicit the testimony at trial.

We are also unpersuaded by defendant's contention that Diluglio's statements did not actually prompt the complainant to leave. The complainant testified that immediately upon returning to the apartment after the assault, she took a shower. When she got out of the shower, she messaged her boyfriend to tell him what had happened. As previously stated, she was nervous about leaving the apartment because she knew that defendant had a gun and had told her not to leave. She testified that she was "[s]till anxious and scared" when she spoke with Diluglio the following morning. After she spoke with Diluglio, and he told her that she needed to leave, she then texted her mother who later arrived with her cousin and boyfriend to pick her up from defendant's apartment.

On cross-examination, the complainant also stated that her mother, boyfriend, and cousin eventually picked her up after her boyfriend read her messages. The defendant points to this testimony in arguing that Diluglio's statements did not prompt her to leave; instead, she left "when her ride arrived * * *." The defendant's focus on this statement ignores the complainant's prior testimony that, after speaking with Diluglio, she then texted her mother, and it was her mother, among others, who picked her up from defendant's apartment. At this point in her life, the complainant had been taken away, or turned away, from the homes of various friends and family members over a period of several years. She was insistent on evading DCYF care, and at this time, it appeared that defendant's apartment was one of the options, if not

- 16 -

the only option, available to her to avoid being placed in a group home. In considering this, reviewing the entirety of the record, and giving deference to the trial justice's decision, we cannot say that the trial justice abused his discretion by allowing this testimony to stand.

The state also contends that, if this Court were to determine that Diluglio's statements were hearsay, its admission would be harmless error because the "[d]efendant's guilt was sufficiently established by proper evidence, and testimony about Mr. Diluglio's demeanor and statements at the time of [the complainant's] contemporaneous disclosure are cumulative." Because we conclude that the testimony was not offered for its truth, and thus was not hearsay, we need not address this contention.

## IV

## Conclusion

For the reasons set forth above, we affirm the Superior Court's judgment of conviction. The papers in this case may be remanded to the Superior Court.

Justice Goldberg participated in the decision but retired prior to its publication.

**Justice Robinson, concurring.** After much hesitation, I have decided that I am able to join in the Court's opinion. From the beginning, I have been troubled by the trial justice's allowing the complainant to testify (after a timely objection) as follows: "He [i.e., Mr. Diluglio] told me that I needed to leave and that I should get out of there as soon as possible." To my mind, that sentence can be understood as indicating that Mr. Diluglio believed the complainant's allegations and therefore told her that she should "get out of there as soon as possible." Pursuant to that understanding, the statement would have been offered to prove the perceived truth of the matter and would have been impermissible hearsay evidence. However, the Court's opinion points out that, in addition to the possibility that Mr. Diluglio's statement was in effect a statement that he believed that the complainant had been sexually assaulted by the defendant, it is (in the Court's words) "equally plausible that Diluglio urged the complainant to leave the apartment for a host of other reasons." Although I still consider it to be a close question, having carefully considered the just-summarized reasoning, I join the Court's opinion.

In my judgment, the trial justice's overruling of the objection fell within his sound discretion and was not clearly erroneous. *See State v. Oliveira*, 127 A.3d 65, 82 (R.I. 2015).



# STATE OF RHODE ISLAND

## SUPREME COURT – CLERK'S OFFICE

Licht Judicial Complex
250 Benefit Street
Providence, RI 02903

## OPINION COVER SHEET

| | |
|---|---|
| **Title of Case** | State v. William Gilbert. |
| **Case Number** | No. 2025-22-C.A.<br>(P1/20-1751A) |
| **Date Opinion Filed** | April 30, 2026 |
| **Justices** | Suttell, C.J., Goldberg, Robinson, Lynch Prata, and Long, JJ. |
| **Written By** | Chief Justice Paul A. Suttell |
| **Source of Appeal** | Providence County Superior Court |
| **Judicial Officer from Lower Court** | Associate Justice Stephen P. Nugent |
| **Attorney(s) on Appeal** | For State:<br><br>Lindsay Grizzard<br>Department of Attorney General |
| | For Defendant:<br><br>Piper M. Pehrson<br>Rhode Island Public Defender |